**Cassaundra WILKINS, Appellant,**

v.

**Eugene FERGUSON, Appellee.**

**Nos. 05–FM–1555, 05–FM–1556.**

District of Columbia Court of Appeals.

Argued June 6, 2007.

Decided July 19, 2007.

---

Matthew Eisenstein, Washington, with whom James J. Sandman, Richard Kornylak, Dominique Castro, and Joan S. Meier (Domestic Violence Legal Empowerment and Appeals Project), were on the brief, for appellant.

H.A. Cramer, with whom Brian G. Gilmore, were on the brief, for appellee.

Julie Kunce Field, pro hac vice, for amici curiae Justice for Children, Leadership Council on Child Abuse & Interpersonal Violence, Break the Cycle, Ayuda, The District of Columbia Coalition Against Domestic Violence, and Women Empowered Against Violence.

Before REID and KRAMER, Associate Judges, and NEBEKER, Senior Judge.

REID, Associate Judge:

This case involves the challenge of appellant, Cassaundra Wilkins, to the trial court's order allowing her former husband and father of their biological daughter to have unsupervised visits with the child, despite the court's prior findings that he had committed an intrafamily offense against his former wife and his child, and even though no health professional recommended unsupervised visits. We are constrained to reverse the order of the trial court because it does not reflect a consid-

eration of relevant statutory provisions and case law, and because the record evidence does not support it.

## FACTUAL SUMMARY

The record reveals that Mr. Ferguson filed for divorce in March 2001, and the trial court awarded him an Absolute Divorce from Ms. Wilkins on February 20, 2002. The court determined that joint legal custody of their sole biological child, A.F., who was born in Summer 1999, was in the best interest of the child, but that Ms. Wilkins should have primary physical custody of the child, with reasonable rights of visitation by Mr. Ferguson. The court also declared: "There is compelling evidence that [Mr. Ferguson] has committed, and [Ms. Wilkins] has suffered substantial physical, verbal and psychological abuse. This pattern of abuse existed throughout the marriage and had a profound impact on [Ms. Wilkins]."

Subsequently, in response to a motion filed by Ms. Wilkins, the trial court issued a temporary protection order on August 2, 2002, suspending all visitation between Mr. Ferguson and A.F., after A.F. had complained to her mother and others that Mr. Ferguson touched her inappropriately during one of her visits with him.[1] Visitation was to be suspended until A.F.'s therapist submitted a report concerning whether visitation would be appropriate. The trial court issued a twelve-month civil protection order on October 7, 2002, after hearings and after finding that Mr. Ferguson touched A.F. inappropriately; the order continued suspension of supervised visitation.

The court ordered "a home study" or investigation in October 2002. In response to the trial court's order, Jeryl McTootle, a Domestic Relations Officer in the Child Guidance and Family Counseling Clinic of the trial court's Social Services Division, reported the results of the investigation of Ms. Wilkins, Mr. Ferguson, and A.F. on January 13, 2003. The report advised that (1) the Domestic Relations Officer was "uncomfortable proffering any recommendation regarding an unsupervised visitation arrangement" in light of the concern about possible inappropriate touching; (2) "Ms. Wilkins, seemingly a suitable custodian, appears to be providing appropriate care and a suitable home environment for [A.F.]"; (3) due to the restrictions on visitation, the officer "was unable to assess the quality of Mr. Ferguson's relationship with [his daughter]"; and (4) "the opinion of [A.F.'s] attending therapist should be a

---

1. According to a treatment record from the Emergency Department of the Children's National Medical Center, A.F. stated: "Daddy touched my poo poo." She "pointed to her vaginal area." The child's allegation was investigated by the Prince George's County Department of Social Services. Mr. Ferguson lived in that jurisdiction at the time of the accusation against him. A September 17, 2002 letter from a Child Protective Services' employee in the Department stated, in part:

 It is this worker's assessment based on behavioral indicators, that [A.F.] may have been sexually abused. The child has stated that her "daddy touched her poo poo." It is unclear at this time what exactly that statement entails. This is a difficult investi-

gation due to the fact that there seems to be a long history of discord, between the parents as well as extensive use of the judicial system by both parties.

During her September 4, 2002, interview with A.F., the employee observed "the child acting out in what appeared to be a sexual manner. The child put a teddy bear between her legs and then proceeded to thrust herself back and forth on the bear. She began making sexual groanings," but A.F. did not reveal "where she learned that behavior." The Department recommended "[t]hat Mr. Ferguson have supervised visitation with [A.F.], pending recommendations by a mental health professional," and that A.F. "participate[] in age appropriate therapy."

primary consideration given the allegations cited."

On June 16, 2003, Dr. Nicole M. Alford, a Clinical Forensic Psychologist and a supervisor in the trial court's Social Services Division, provided her views concerning visitation. Her conclusions were based upon her review of pertinent records as well as her observation of one visit between A.F. and Mr. Ferguson. She stated: "I would not recommend an unsupervised visitation arrangement at present." She also advised: "To protect both child and father, it would be best to consider these visits when [A.F.] is of an age and developmental level where she can verbalize any possible untoward behavior, and where she can verbalize about the specifics of her visit with her father."

The trial court entered an order on August 5, 2003, which resolved Ms. Wilkins' request for modification of the trial court's visitation order based on a report from A.F.'s therapist, Miranda S. Grant, a licensed clinical social worker and the Clinical Director of Grant–Grayton Urban Supports, Inc. Ms. Grant stated: "At this time (November 6, 2002) there is reasonable evidence that contact with father should be limited and monitored until treatment can progress further." She cautioned against unsupervised visits: "There is significant evidence to support elimination of unsupervised visits with father."[2] Ms. Wilkins asked for supervised visitation, and Mr. Ferguson advocated unsupervised visits or, in the alternative, visits supervised by his mother or another family member. The trial court recognized that its August 2003 decision was to be guided by D.C.Code § 16–1005(c–1) which specifies that a person who has committed an intrafamily offense has the burden to show that "visitation will not endanger the child or significantly impair the child's emotional development," and that "the child and the custodial parent can be adequately protected from harm inflicted" by a person previously found to have committed an intrafamily offense. The court decided that Mr. Ferguson's visits with his daughter should resume but should be supervised by his mother, and that at first they should only be day visits but, "absent further objection by either party, the visitation shall progress to overnight visitation after 4 months of day visits."

Later, in November 2003, the trial court determined that "supervision will be necessary up until the 12/20/03 visit only"; and from January 2004 through April 9, 2004, Mr. Ferguson had unsupervised overnight visits with his daughter. Beginning around October 2003, A.F. was under the care of an associate psychotherapist, Sylvia Rosario of the Afro–American Counseling and Psychotherapy Institute. Ms. Rosario's education included an undergraduate degree in psychology, a masters degree in education, courses in counseling and psychotherapy, and at the time of her involvement with A.F., she had around thirty years of experience in counseling. Ms. Rosario provided an affidavit for the court, dated December 6, 2004, and later testified during hearings held in 2005.

Ms. Rosario's therapy notes reveal that she scheduled a session with A.F. following the child's November 2003 visit with her father. At that session, Ms. Rosario noted that A.F. "was irritable, unresponsive, and

---

**2.** The therapist was unable to determine definitively whether Mr. Ferguson had touched his daughter inappropriately. The child used the word "bad" in reference to her father. The therapist explained: "It is certainly possible that the [child's] statements are related to [the] custody issue and conflict over lack of contact. This is not to say that there was not touching but the nature of the treatment format does not encourage immediate disclosure."

generally in an unhappy mood." A.F.'s mood "was in stark contrast to her mood during sessions that occurred before she resumed visitation with Mr. Ferguson." Thereafter, in sessions with Ms. Rosario, A.F. "voluntarily made statements [] regarding the sexual abuse that she had suffered, stating, for example, that 'my Daddy put a stick in my poo-poo.' " [3] Ms. Rosario believed that A.F. "mistakenly held her mother, [Ms.] Wilkins, responsible for forcing her to attend visitation against her will." A.F. made another accusation against Mr. Ferguson during an April 2004 session with Ms. Rosario. She said that her father "had 'put a stick in her poo-poo.' " Ms. Rosario asked A.F. to draw a picture of what happened, and also to demonstrate by using a doll. A.F. drew the picture and pointed to the doll's buttocks. Ms. Rosario "concluded that A.F. ha[d] been traumatized by sexual abuse during visitation in 2002 and between November 2003 and April 2004." The therapist "strongly urged Ms. Wilkins to take legal action to suspend Mr. Ferguson's visitation with A.F. to protect A.F. from further sexual abuse and the emotional trauma associated with visiting Mr. Ferguson under any circumstances, supervised or unsupervised, until such time when A.F.'s physical and emotional safety while visiting Mr. Ferguson can be assured." A.F. was examined at the Children's National Medical Center on April 15, 2004, and "vaginal redness" was detected. The doctor who examined A.F. noted on the "assessment/diagnosis line of the medical record:" "Child disclosed that she saw Dad touching [illegible—either his or her] 'private' parts"; and "possible trauma to vaginal area."

Ms. Wilkins obtained a temporary protection order on April 22, 2004, which temporarily suspended Mr. Ferguson's visits with A.F. The court also scheduled a hearing on Ms. Wilkins' request for a civil protection order, and in May 2004, directed that a mental health evaluation of A.F. be completed "for the purpose of evaluating [A.F.'s] relationship and visitation with [her] father." In addition, the court ordered mental health evaluations of Ms. Wilkins and Mr. Ferguson "for the purpose of determining the appropriateness of [the] current visitation arrangement." [4]

3. In her December 27, 2003 note, Ms. Rosario wrote, "near the end of the session and after returning from the bathroom with her mother, [A.F.] confronted me with a determination and self-assured, unexpected announcement of, 'my daddy put a stick in my poo-poo.' " Ms. Rosario thought that A.F. "may be entering a phase where she is more able to articulate her thoughts and feelings about the incident." She was not certain whether A.F. was reporting a new incident. Ms. Wilkins "speculated that going to the bathroom may have triggered a recollection of the incident(s)." Ms. Rosario's November 11, 2004 therapy note indicates that she asked A.F. "if she had seen 'her Daddy.' " A.F.'s "immediate reply was 'no, cause he's gonna hurt my poo poo again.' " Ms. Rosario wrote: "The rapidity, the clarity and certainty of the response is cause for concern, indicating that she is associating sexual abuse with her father, that the abuse is vivid in her mind and such an associ-ation could manifest in hostility and mistrust toward boys or men, and maladjustment in psychosocial and psychosexual development."

4. The trial court issued a supplemental order that "the mental health examination [should] address the following issues:"
 1. Whether the allegations concerning Mr. Ferguson's alleged inappropriate behavior towards his daughter are true and supported by the evidence?
 2. If the allegations are not true, is the child being influenced, explicitly or implicitly, to make the allegations against Mr. Ferguson and by whom?
 3. What are the child's opinions about her parents and are her opinions biased by parental influence?
 4. Does either parent suffer from mental health issues that contribute to the circumstance that has led to the making of these allegations?

Mr. Ferguson filed a motion seeking to hold Ms. Wilkins in contempt of court for violation of the visitation order, and claiming that the allegations in Ms. Wilkins' petition for a civil protection order "are totally false and malicious."

Dr. Michael Gilliard, a licensed clinical psychologist employed by the Youth Forensic Services Division of the District of Columbia's Department of Mental Health, conducted a psychological evaluation of A.F. in July 2004; at that time, A.F. had reached age 4. During her session with Dr. Gilliard, A.F. described her father as "a bad daddy," stating that Mr. Ferguson "pushed me, when I was not bad." Nevertheless, "the results of the Psychological Evaluation indicated that overall, [A.F.] is not displaying any major concerns." Dr. Gilliard added a cautionary note: "Despite the general appropriateness of [A.F.'s] functioning, the allegations of inappropriate parental touching remain a superordinate factor with regards to her functioning." Dr. Gilliard concluded that A.F. would need continued counseling, whether or not the inappropriate touching occurred.[5]

Dr. Gilliard completed psychological evaluations of Ms. Wilkins (in July 2004) and Mr. Ferguson (in October 2004), finding that (1) both parents were experiencing some emotional distress; (2) Ms. Wilkins "occasionally employs some denial," "attempts to avoid stressful situations and employs a significant amount of defensiveness," and "might view her child as somewhat demanding and occasionally unhap-

py"; (3) Mr. Ferguson "displayed several narcissistic mannerisms," including "an elevated estimate of his own self worth, an air of imperturbability, and a tendency to be somewhat self-indulgent," (4) Mr. Ferguson "displays indifference to others" and "at times, appears to devalue others," (5) Mr. Ferguson "remains vulnerable to being overwhelmed by stressful situations," and his "ability to independently parent is mildly reduced." Dr. Gilliard recommended individual psychotherapy for Ms. Wilkins "to address emotional issues." For Mr. Ferguson, Dr. Gilliard recommended both individual psychotherapy as well as family therapy (with his daughter), but not before A.F.'s "treating clinician deems it appropriate." Dr. Gilliard specified that "[t]he family therapy sessions [recommended for Mr. Ferguson] should be continued until such time as some measure of clinical clarity can be established with regards to the validity of the prior sexual molestation allegations"; and that "[t]he decision of when to reestablish Mr. Ferguson's supervised visitation should be made in part with information from the family therapy clinician."

On June 14, 2005, Ms. Wilkins filed a motion to modify the trial court's "custody determination regarding [A.F.] to suspend visitation by [Mr.] Ferguson until ... [he] has successfully completed both individual therapy designed to treat perpetrators of child sexual abuse and subsequent family-oriented therapy with A.F. to help prepare A.F. for [Mr. Ferguson's] reintroduction

---

5. What if any visitation should be allowed between Mr. Ferguson and the daughter and under what conditions?

**5.** As Dr. Gilliard put it:
In particular, if the inappropriate and sexualized touching did occur, [A.F.] will need to continue to receive her counseling services to address the ramifications of the abuse. If the inappropriate touching did

not occur, one of the goals of [A.F.'s] counseling services should be to develop a better understanding of her rationale for making the abuse allegations.... Furthermore, as she continues to utilize her counseling services, her treating clinician will be able to develop increasing insight into the validity of the allegations.

into her life." She also requested that any subsequent visitation be "supervised by the Court in order to ensure A.F.'s physical and emotional well-being is protected." Mr. Ferguson opposed the motion, essentially on the ground that the allegations against him were false. A hearing on Ms. Wilkins' motion to modify took place on four days—June 14, 2005, June 15, 2005, October 6, 2005, and November 18, 2005.[6]

Ms. Rosario testified at the hearing and summarized her earlier report, detailed above.[7] In addition, when asked about the appropriateness of visitation, she said it was not advisable, because "Mr. Ferguson should get counseling and it should begin immediately." Furthermore, A.F. "should probably not be visiting with him until she's quite old enough to articulate what can go on, what's happening between the two of them." Even court supervised visitation would not be appropriate "at this time" because "it would exacerbate whatever is going on with [A.F.] right now, exa[cerb]ate the damage that's been done." Ms. Rosario stated that unsupervised visits

would not be appropriate "at this time," but could take place "after [A.F. is] much more mature, a young adult perhaps and she's able to decide whether or not ... she wants to see her dad and she can do it and still maintain a healthy demeanor." Ms. Rosario did not believe that Ms. Wilkins had coached A.F. to make the accusations against her father.

Dr. Catherine Anderson testified as an expert for Ms. Wilkins. Dr. Anderson's testimony at the 2005 hearing was consistent with her written report which stated, in part, "An extensive review of the record and interview with [A.F.'s] treating therapist regarding the current accusations produced no information that would be disconfirmatory of the court's prior finding that [A.F.] was the victim of 'inappropriate touching' by her father." At the time of her testimony, Dr. Anderson had been a licensed clinical psychologist for twenty-five years. She had a private therapy and psychoanalytic therapy practice focusing on adolescents and adults, and had authored several papers on child abuse which

6. Both Mr. Ferguson and Ms. Wilkins presented testimony from fact witnesses. Mr. Ferguson's mother never noticed any abuse on her son's part, either toward A.F., or A.F.'s one-year younger half-sister. The mother of Mr. Ferguson's younger daughter testified that her daughter had never made any complaints against Mr. Ferguson. Mr. Ferguson denied ever abusing A.F. and maintained that A.F. has eczema which causes her to break out in a rash "all over her body"; including the pubic and buttock areas. "[I]f scratched a lot," the areas can become red. Ms. Wilkins recounted A.F.'s complaints about her father "touching [her] poo-poo"; A.F.'s moods and behavior and the child's nightmares, bed wetting and grinding of her teeth after her complaints about her father during certain unsupervised visits; Ms. Rosario's therapy sessions with A.F.; and A.F.'s treatment at Children's National Medical Center. Ms. Wilkins' mother provided testimony about A.F.'s complaint of sexual abuse about her father, her examination of A.F.'s vaginal area,

the visit to Children's National Medical Center, and A.F.'s nightmares and her "kicking" while sleeping,

7. Ms. Rosario discussed some of her progress notes, including the December 27, 2003 note concerning A.F.'s statement, "my daddy put a stick in my poo-poo." She "thought that perhaps when [A.F.] went to the bathroom, it did trigger ... what had happened to her[,] that her daddy had put a stick in her poo-poo." She also thought about the possibility that Ms. Wilkins had prompted A.F. to make the statement, but later testified that she did not believe Ms. Wilkins coached A.F. Ms. Rosario interpreted A.F.'s statement, "put a stick in my poo-poo" to mean "that her father had ... touched her inappropriately with his penis." She also discussed the drawings A.F. made relating to her accusation against her father, and what A.F. said regarding those drawings. She described A.F. during those discussions as "very matter of fact and just unequivocal about it."

appeared in professional journals and handbooks. The trial court qualified her as a clinical psychologist with an expertise in family abuse. In preparation for her report and testimony, Dr. Anderson reviewed Ms. Rosario's therapy notes, medical records from Children's National Medical Center, court records dating from 2002, and the September 17, 2002, letter from the Prince George's County Department of Social Services. Dr. Anderson maintained that A.F.'s "age inappropriate unusual kind of physical presentation" which included "gyrating hips," as described in the September 17th letter from Prince George's County, "would be a very unusual presentation from a child unless [the child] had an actual experience of trauma."

In Dr. Anderson's view, if a child has been coached concerning her accusation of abuse, the "child [] does sort of a recitation of fact without . . . elaboration. . . ." Sexual groaning by a child "is . . . associated with what's called implicit memory, a reenactment of something that's occurred when somebody . . . does not express it verbally." Dr. Anderson found significant not only A.F.'s "consistent report of what had happened," that is, "the same central detail[]" ("her father touched her poo-poo") in A.F.'s separate accounts to her mother, grandmother, and therapist, but also A.F.'s "physical signs of genital reddening and that it is . . . painful swollen genitals." Furthermore, Dr. Anderson declared, "[c]hildren have to try to describe things in their own language . . . and children will often think of an erect penis as a stick"; children have referred to the "stick" as "purple" or "red." Dr. Anderson's written report declared that "[n]o resumption of supervised visitation should occur until [Mr. Feguson] has successfully completed his treatment protocol and, in consultation with his therapist, [A.F.'s] treatment provider agrees that she is ready to resume supervised visitation." In Dr. Anderson's

view family therapy also was essential to a resumption of supervised visitation, and such visitation "should be done through the courts."

When asked about Dr. Alford's report that A.F. was observed being "very relaxed and comfortable" with her father, Dr. Anderson explained that "sexual abuse occurs within the context of an overall relationship and kids can love their parents" but still experience sexual abuse. Reacting to Dr. Alford's suspicion regarding the truthfulness of A.F.'s accusation at age two, Dr. Anderson stated that suspicion is "not consistent with the research which is that children down to about age . . . eighteen months, [] can often render highly accurate verbal descriptions of abuse." Dr. Anderson agreed with Dr. Gilliard's report that Ms. Wilkins' has a "personality style . . . such that she would be less inclined to see [trouble]," "that she attempts to avoid stressful situations like being in court . . ., and will readily attempt to avoid interpersonal conflict"; thus, Dr. Anderson "found no support" for the proposition that Ms. Wilkins' "coached" A.F. to make the sexual abuse accusation against Mr. Ferguson. And, Dr. Anderson referenced the literature on child abuse to take issue with other views expressed by Dr. Alford.

Dr. Alford testified at the request of the trial court and her direct examination was conducted by the trial judge. Dr. Alford supervised the home investigation study carried out by Jeryl McTootle, a Domestic Relations Officer in the Social Services Division of the Superior Court of the District; and she contended that Dr. Anderson's report contained "misrepresentations of some of the studies that were used to form the basis of her opinions, as well as some of the conclusions that she drew . . . from more clinical data." The "misrepresentations, and indeed some

omissions of key points that were not provided to the Court, may have led to an imbalanced view." The trial judge reminded Dr. Alford that he "had [] made a finding of int[ra]family offense against Mr. Ferguson," and inquired, "is it fair to say that you had some questions about my finding?" Dr. Alford replied, "No, I wouldn't say that's fair ... I wasn't questioning your findings." The judge continued, "I thought, when I read your report, ... you raised some questions about the likeliness of the initial int[ra]family offense having occurred." Dr. Alford stated, in part, "the fact that the allegations arose inside of a highly acrimonious divorce and marital relationship ..., coupled with the child's age at the time of disclosure, was for me something that rendered these allegations, I'm going to say questionable, for lack of a better word." The judge also wanted to confirm his understanding that Dr. Alford (in her 2003 report) was "recommending essentially, ... supervised visits, protections of all the parties, including Mr. Ferguson being subject to additional allegations ...[,] [a]nd the possibility, if the allegations were true, to protect the child." Dr. Alford responded, "That's correct." When the judge asked Dr. Alford whether she could "make a recommendation about current visitation," she said, "Well, I definitely wouldn't be able to make any recommendation at this point, because it's been several years since I have had any involvement." She added, "I understand there's been significant developments, some of which I'm probably not even aware of, and so, no, I would be very ill-prepared and unethical, indeed, to try to make any recommendation on this point in time."

The trial court focused on two questions in its December 15, 2005 order:

(1) whether Ms. Wilkins presented sufficient evidence to find that Mr. Ferguson engaged in inappropriate touching of his daughter after the first finding or are there other substantial and material changes that have occurred since the issuance of the visitation order, and if so (2) whether continued visitation between Mr. Ferguson and his daughter is in the child's best interest.

The trial court found "insufficient evidence to conclude that Mr. Ferguson engaged in inappropriate touching or conduct with his child since the new visitation order was instituted," but that A.F.'s "repeated assertions about her father since the institution of the visitation order[,] ... constitutes a substantial and material change in circumstances." As to "whether continued visitation is in the best interest of the child[,]" the judge declared:

For the most part, the child's statements have followed overnight visitations with her father. It may be that the child is responding to Ms. Wilkins' reactions to the visitations. Or it may be that the child senses her mother's discomfort or instinctively responds to her mother's inquiries and concerns after such visitation. To lessen the conflict that exists within the child, the Court finds that it is in her best interest to limit visitation to day visits until such time as the child is able to independently and maturely request additional overnight visitation with her father.

The trial court modified its visitation orders "to allow Mr. Ferguson to have the right of unsupervised visitation every other weekend from Saturday 12:00–5:00 p.m. and Sunday 12:00–5:00 p.m."

Responsibility for this case was assigned to another trial judge as of January 1, 2006. On January 5, 2006, after seeing Ms. Wilkins' motion for a stay pending appeal and for expedited consideration, which had not then been certified, the newly assigned judge issued an order, *sua*

*sponte,* which restricted Mr. Ferguson's visitation with A.F. to supervised visitation at the Court Visitation Center, and which stayed the order for unsupervised visitation. On January 12, 2006, Ms. Wilkins filed notices of appeal in family cases No. DR 757–01 (the divorce and custody determination case relating to Mr. Ferguson's motion for contempt) and No. IF 2261–02 (the civil protection order matter in which Ms. Wilkins sought to modify the trial court's visitation order). Since both cases involved the trial court's December 15, 2005 order, the cases were consolidated in this court.

## ANALYSIS

### Summary of Arguments

Ms. Wilkins contends that the trial court erred by failing to recognize that not only must a person who seeks to modify a visitation order show "a change in circumstances" under D.C.Code § 16–914(f) (2006 Supp.), but that where the trial court has found that one of the parties has committed an intrafamily offense, that party "has the burden of proving that visitation will not endanger the child or significantly impair the child's emotional development," pursuant to D.C.Code § 16–914(a–1). She maintains that "in holding that there was 'insufficient evidence' to prove sexual abuse, the court placed the risk of error on *the child,* rather than on the adjudicated offender," and that "[t]he legislature's burden of proof provision [in § 16–914(a–1)] is designed to avoid exactly that." Ms. Wilkins further argues that "the trial court misapplied the best interest analysis required by the modification statute [§ 16–914(f),]" by not taking into consideration the factors set forth in § 16–914(a)(3), including "the mental and physical health of all individuals involved"; and "the evidence of an intrafamily offense as defined in § 16–1001(5)." In addition, Ms. Wilkins

faults the trial court for "ignor[ing] the unanimous recommendation of four different psychological professionals [Dr. Alford, Dr. Gilliard, Ms. Rosario and Dr. Anderson] that visitation be, at most, supervised." Finally, Ms. Wilkins asserts that the trial court's "speculation that A.F. may have fabricated her claims of sexual abuse on her own volition, without any coaching from her mother, ... lack[s] any scientific basis in the record [,] is unsupportable"; and "the trial court's analysis ... rests entirely on fundamental factual errors."

Mr. Ferguson in essence argues that when the entire record dating from 2002 is considered, the trial court properly applied the statutory provisions "in reinstating Mr. Ferguson's visitation rights," since "during the divorce proceedings when custody and visitation was [sic] awarded[,]" "the court considered evidence of spousal abuse[;]" it "applied [§ 16–914] a–1 in its August 1, 2003 visitation determination that followed the allegations against Mr. Ferguson toward the child[;]" and it "utilized the well established ... best interest of the child standard in this decision." He insists that "[t]he trial court did not ignore all the evidence presented by mental health professionals[,] just the evidence deemed unreliable and lacking credibility," including that presented by Dr. Anderson whom the court "found ... *not credible* for purposes of the motion under appeal[;]" and Ms. Rosario whom the court "note[d] on two occasions ... is 'not licensed' for purposes of this case and the allegations" and who "undertook therapy with the child with the assumption that she was a victim of abuse." He states that "[t]he expert relied upon mostly [by] the court in this case ..., Dr. Nicole Alford, had greater knowledge of the parties, the facts of the case, and a longer history in the case." He also maintains that Ms. Wilkins failed to prove that

Mr. Ferguson had engaged in inappropriate touching of A.F. since the new visitation order was issued. And, Mr. Ferguson disputes Ms. Wilkins' assertion that the trial court made factual errors; he focuses mainly on the September 17, 2002, letter from the Prince George's County Department of Social Services, claiming that "[t]he letter, for the most part, is replete with statements that are factually incomplete and confusing."

Amici asserts that "[t]he record evidence of sexual abuse in this case far exceeds that which is ordinarily present in cases [where] child sexual abuse [is found]." They complain that "[i]nstead of deferring to the opinions of the many outside sexual abuse professionals who evaluated A.F., and the reported history and hospital and caseworker records, the court attempted, without scientific basis, to explain what instead *might* have motivated the child to make such things up," and that the trial court's reaction to the professionals "was based on several common myths and misconceptions," including "that child sexual abuse is commonly fabricated in custody litigation"; and "that a child might respond to parental hostility between her parents by fabricating sexual claims." Amici believes that the trial court's "failure to address [the] history" of Mr. Ferguson's abuse of Ms. Wilkins during their marriage "in assessing the credibility of the sexual abuse allegations and the concomitant risk of harm to the child is itself independent grounds for reversal here."

■ For the reasons set forth below, we conclude that the record does not support the factual findings reached by the trial court. We also conclude that because of the trial court's two previous orders in which it found that Mr. Ferguson had committed intrafamily offenses (the divorce decree finding physical abuse against Ms. Wilkins and the order of Octo-

ber 7, 2002, finding that Mr. Ferguson had inappropriately touched A.F.), the court was required, yet failed to make, the findings required by § 16–914(a–1) as a predicate to awarding visitation that "the child and custodial parent can be adequately protected from harm inflicted by [Mr. Ferguson]" and that Mr. Ferguson had met his "burden of proving that visitation will not endanger the child or significantly impair the child's emotional development." Consequently, we reverse the judgment of the trial court.

### Applicable Legal Principles

■ Our analysis of these arguments is guided by several legal principles. Generally, "[w]e review the trial court's legal determinations *de novo* and its findings of fact under a clearly erroneous standard." *In re A.C.G.,* 894 A.2d 436, 439 (D.C.2006) (citing *In re J.D.W.,* 711 A.2d 826, 830 (D.C.1998)); under D.C.Code § 17–305(a) (2001), "the [trial court's] judgment may not be set aside except for errors of law unless it appears that the judgment is plainly wrong or without evidence to support it," *In re N.D.,* 909 A.2d 165, 169 (D.C.2006). "Findings of fact which result from a misapprehension as to the applicable law, however, lose the insulation of the 'clearly erroneous' rule." *In re L.L.,* 653 A.2d 873, 880 (D.C.1995) (citing *Murphy v. McCloud,* 650 A.2d 202, 210 (D.C.1994)). "Similarly, the exercise of discretion must be founded on correct legal principles." *Id.* (citing *Link v. District of Columbia,* 650 A.2d 929, 934 (D.C.1994)). We commit parental visitation issues relating to children to the sound discretion of the trial court, and our standard of review is abuse of discretion, but again, the exercise of judicial discretion must be grounded "upon correct legal principles and must rest on a firm factual foundation." *In re T.L.,* 859

A.2d 1087, 1090 (D.C.2004) (citing *In re Ko. W.*, 774 A.2d 296, 303 (D.C.2001)).

▮ Furthermore, in visitation cases, "[a] proper exercise of discretion requires that a court fashion relief to foster and safeguard [the] child's best interests," and "visitation should not occur ... until such time as [the child is] psychologically prepared for it." *Lewis v. Lewis*, 637 A.2d 70, 72 (D.C.1994) (citing *Hamel v. Hamel*, 489 A.2d 471, 475 (D.C.1985)) (internal quotation marks and other citation omitted). As our cases have emphasized, "in all proceedings affecting the future of a minor, the decisive consideration is the best interests of the child," and consequently, "[t]he court must act as *parens patriae* in the child's interest, and must not expose her to serious risk of harm." *In re S.L.E.*, 677 A.2d 514, 519 (D.C.1996) (citing *In re S.C.M.*, 653 A.2d 398, 405 (D.C.1995); *In re L.L.*, *supra*, 653 A.2d at 886–87)). Hence, "judges should 'monitor the situation carefully and promptly take steps to protect [the child] if her physical or emotional welfare is endangered.'" *Id.* at 519 (citing *In re S.C.M.*, *supra*, 653 A.2d at 406 n. 12). Of course, our statutes pertaining to parent/child matters "presume[] that contact with both parents is normally in the best interests of the child." *In re D.M.*, 771 A.2d 360, 366 (D.C.2001) (citing *In re M.D.*, 602 A.2d 109, 114 (D.C.1992)). "A parent's right of visitation, however, is not absolute." *Id.* Thus, where visits with one parent have "detrimental effects" or "would place [the child's] emotional welfare at risk," the parental right to immediate and ongoing visitation may have to yield, or may need to be closely supervised. *Id.* This is particularly true where, as here, the trial court has found that a parent committed an intrafamily offense.

▮ If statutes are involved, a question of statutory construction is reviewed *de novo*, and we examine, first, the plain language of the statute and its meaning. *Cass v. District of Columbia*, 829 A.2d 480, 482 (D.C.2003). Where more than one statutory provision is involved and if those provisions are "capable of more than one reading, our task is to search for an interpretation that makes sense of the statute as a whole." *Id.; see also District of Columbia v. Gallagher*, 734 A.2d 1087, 1091 (D.C.1999). And, "we turn to legislative history to determine whether our interpretation is consistent with legislative intent." *Cass, supra*, 829 A.2d at 482 (citing *Peoples Drug Stores, Inc. v. District of Columbia*, 470 A.2d 751, 754 (D.C.1983)).

### The Statutory Framework

These consolidated cases require an interpretation and application of related statutory provisions. Chapter 9 of Title 16 of the District of Columbia Code addresses matters pertaining to divorce, including parental custody and visitation of children. Chapter 10 of Title 16 concerns intrafamily offenses, which often prompt a request for protection orders. Provisions from both chapters are relevant to the resolution of this case. Read as a whole, *see Cass, supra*, D.C.Code § 16–914 addresses the care and custody of children and parental visitation—matters over which the trial court retains jurisdiction after issuing a divorce decree. D.C.Code § 16–914(a)(3) dictates that the primary guiding principle "in determining the care and custody of a child" is "the best interest of the child." Factors to be considered when a judge decides what is in the best interest of the child include those articulated in § 16–914(a)(3)(E) ("the mental and physical health of all individuals involved") and § 16–914(a)(3)(F) ("evidence of an intrafamily offense").[8]

8. Section 16–914(a)(3) provides:

In determining the care and custody of a

Because of the likelihood that the continuing care of a child will be affected where a parent has been found to have committed an intrafamily offense against the custodial parent or against the child, the legislature enacted D.C.Code § 16–914(a–1) which mandates that the judicial officer must ensure that both the child and the custodial parent are protected and placed the burden of proof on the perpetrator of the intrafamily offense to show "that visitation will not endanger the child or significantly impair the child's emotional development." [9] However, pursuant to D.C.Code § 16–914(f)(1) and (2), the parent who seeks a modification of a court order pertaining to custody and visitation bears the initial burden of demonstrating that the modification of a prior order is necessary due to "a substantial and material change in circumstances." [10]

■ Chapter 10 must be addressed in our statutory construction, not only because it is specifically mentioned in D.C.Code § 16–914(a–1) and contains the definition of an intrafamily offense in § 16–1001(5)—"intrafamily offense means

child, the best interest of the child shall be the primary consideration. To determine the best interest of the child, the court shall consider all relevant factors, including, but not limited to:
(A) the wishes of the child as to his or her custodian, where practicable;
(B) the wishes of the child's parent or parents as to the child's custody;
(C) the interaction and interrelationship of the child with his or her parent or parents, his or her siblings, and any other person who may emotionally or psychologically affect the child's best interest;
(D) the child's adjustment to his or her home, school, and community;
(E) the mental and physical health of all individuals involved;
(F) evidence of an intrafamily offense as defined in section 16–1001(5);
(G) the capacity of the parents to communicate and reach shared decisions affecting the child's welfare;
(H) the willingness of the parents to share custody;
(I) the prior involvement of each parent in the child's life;
(J) the potential disruption of the child's social and school life;
(K) the geographic proximity of the parental homes as this relates to the practical considerations of the child's residential schedule;
(L) the demands of parental employment;
(M) the age and number of children;
(N) the sincerity of each parent's request;
(O) the parent's ability to financially support a joint custody arrangement;
(P) the impact on Temporary Assistance for Needy Families, or Program on Work, Employment, and Responsibilities, and medical assistance; and
(Q) the benefit to the parents.

9. Section 16–914(a–1) specifies:

For the purposes of this section, if the judicial officer finds by a preponderance of evidence that a contestant for custody has committed an intrafamily offense, any determination that custody or visitation is to be granted to the abusive parent shall be supported by a written statement by the judicial officer specifying factors and findings which support that determination. In determining visitation arrangements, if the judicial officer finds that an intrafamily offense has occurred, the judicial officer shall only award visitation if the judicial officer finds that the child and custodial parent can be adequately protected from harm inflicted by the other party. The party found to have committed an intrafamily offense has the burden of proving that visitation will not endanger the child or significantly impair the child's emotional development.

10. Section 16–914(f)(1) and (2) state:

(1) An award of custody may be modified or terminated upon the motion of one or both parents, or on the Court's own motion, upon a determination that there has been a substantial and material change in circumstances and that the modification or termination is in the best interest of the child. (2) When a motion to modify custody is filed, the burden of proof is on the party seeking a change, and the standard of proof shall be by a preponderance of the evidence.

an act punishable as a criminal offense committed by an offender upon a person: (A) to whom the offender is related by blood, legal custody, marriage, having a child in common, or with whom the offender shares or has shared a mutual residence ..."—but also because Chapter 10, § 16–1005 governing hearings in petitions for civil protection orders contains a subsection (c–1) which mirrors § 16–914(a–1).[11] Thus, the legislature twice, and consistently, stressed two propositions: (1) a parent's commission of an intrafamily offense could impact the custody decision and result in a limitation on parental visitation rights; and (2) intrafamily offenses result in both emotional and physical harm to children. In that regard, and significantly, the plain words of both § 16–914(a–1) and § 16–1005(c–1) do not place a time limit on the consideration of an intrafamily offense, or distinguish between an intrafamily offense committed prior to or after the issuance of an initial custody and visitation order, or require a finding that a new intrafamily offense has been committed, when considering requests for modification of prior court orders.

The legislative history of § 16–914(a–1) reflects the Council of the District of Columbia's intent that "the court [] admit evidence of domestic violence in all child custody cases, not just during the pendency of divorce or annulment proceedings," since "[r]esearch reveals that children exposed to spouse abuse often suffer emotional and physical harm." Council of the District of Columbia, Committee on the Judiciary, Report on Bill 10–7, the "evidence of Intrafamily Offenses in Child Custody Cases Act of 1994," April 27, 1994 ("Legislative History"), at 3. For this reason, apparently, the Council decided to require "the court [to] make specific written findings which support a determination that awarding custody or granting visitation to the person found to have committed the intrafamily offense is in the child's best interest." *Id.* The Council was not the only legislative body to recognize the connection between domestic violence and decisions about custody and visitation. As the 1994 Legislative History pointed out, "at least 32 states have legislation which requires courts to consider domestic violence when fashioning custody and visitation awards," and "[a]t least 8 states have enacted statutes that create a presumption that it is not in the best interest of the child to award custody to an abusive parent." *Id.* And, contrary to Mr. Ferguson's argument that an intrafamily offense should not follow a person for an unlimited period of time, the legislature put no restrictions on how long an intrafamily offense could be considered in care and custody determinations, including parental visitation. Instead, the legislature added a rebuttable presumption provision which allows the perpetrator of an intrafamily offense to prove that his or her visitation would not endanger a child or interfere with the child's emotional development.

---

11. Section 16–1005(c–1) reads:

For the purposes of subsection (c)(6) and (7) of this section, if the judicial officer finds by a preponderance of evidence that a contestant for custody has committed an intrafamily offense, any determination that custody or visitation is to be granted to the abusive parent shall be supported by a written statement by the judicial officer specifying factors and findings which support that determination. In determining visitation arrangements, if the judicial officer finds that an intrafamily offense has occurred, the judicial officer shall only award visitation if the judicial officer finds that the child and custodial parent can be adequately protected from harm inflicted by the other party. The party found to have committed an intrafamily offense has the burden of proving that visitation will not endanger the child or significantly impair the child's emotional development.

■ In short, the plain words of §§ 16–914 and—1005(c–1) and the legislative history command courts to focus on the best interest of the child principle, and a parent's intrafamily offense in making decisions about custody and visitation. Thus, while a party seeking modification of a custody or visitation award must always prove by a preponderance of evidence "that there has been a substantial and material change in circumstances and that the modification is in the best interest of the child," D.C.Code §§ 16–914(f)(1)–(2), once such a finding is made in any case in which a prior finding of an intrafamily offense has occurred, that prior finding, under § 16–914(a–1), shifts the burden to the perpetrator of the offense to prove that the visitation or custody arrangement will not endanger the child or impair the child's emotional development. Simply put, the Council has decreed that a history of domestic abuse will always be relevant at every custody or visitation proceeding in which the abuser is involved.

### The Trial Court's Order

In light of the legal principles, statutory provisions, and legislative history detailed above, our review of the trial court's order constrains us to agree generally with the arguments presented by Ms. Wilkins and amici, rather than those presented by Mr. Ferguson, and to conclude that the order must be reversed because it is not "founded on correct legal principles," *In re L.L.,* *supra,* 653 A.2d at 880, and because it does not "rest on a firm factual foundation," *In re T.L., supra,* 859 A.2d at 1090. We have no doubt about the trial court's knowledge of the law, including the governing statutory scheme (the court discussed D.C.Code § 16–1005(c–1) in its August 5, 2003 order relating to visitation). Nor do we doubt the quality time the judge spent on this case from 2001 through 2005. But our specific task is to review and to concen-trate primarily on the December 15, 2005 order from which appeals have been taken, and that order not only contains no reference to applicable statutory provisions and case law, but also does not accurately reflect the reports and testimony of the health professionals involved in this case.

In addition to the general conclusions which prompt our reversal of the trial court's order of December 15, 2005, there are at least three specific reasons why we cannot affirm the order. First, the trial court did not reverse its earlier findings that Mr. Ferguson committed an intrafamily offense against Ms. Wilkins (February 20, 2002 order), and against A.F. (October 7, 2002 finding). And, even if a court finds that a parent has not committed a *new* intrafamily offense, D.C.Code §§ 16–914(a–1) and—1005(c–1) require the court to consider whether the perpetrator of a *prior* intrafamily offense—in this case, Mr. Ferguson—has sustained his "burden of proving that [his] visitation [with his child] will not endanger [the child] or significantly impair [the child's] emotional development." Because the court did not do so here, nor make the required finding under § 16–914(a–1) "that the child and custodial parent can be adequately protected from harm inflicted by the other party, the court's order is not founded on correct legal principles, and loses its insulation of the clearly erroneous standard of review." *In re L.L., supra,* 653 A.2d at 880. Our cases counsel that "visitation should not occur … until such time as [the child is] psychologically prepared for it," *Lewis, supra,* 637 A.2d at 72, and that the court's role as *parens patriae* is to safeguard the child against "serious risk of harm," *In re S.L.E., supra,* 677 A.2d at 519.

■ Second, no expert testified that unsupervised visits between Mr. Ferguson and A.F. would be appropriate and hence

there simply is no evidence in the record supporting the trial court's decision to modify the visitation orders to grant Mr. Ferguson "the right of unsupervised visitation," except for Mr. Ferguson's testimony and perhaps that of his mother, and neither he nor his mother was qualified to address the statutory inquiry as to the impact of his unsupervised visitation upon A.F.'s "emotional development." Indeed, the record shows that no health professional believed that A.F. was psychologically ready to resume unsupervised visits with her father. Moreover, the trial court apparently did not heed the health professionals' concerns about the risk of visitation, especially unsupervised visitation, to A.F.'s emotional development. Simply put, the order permitting unsupervised visitation is "without evidence to support it." *In re N.D., supra*, 909 A.2d at 169.

Notably, Dr. Gilliard, who conducted court ordered psychological examinations of A.F., Ms. Wilkins, and Mr. Ferguson, did not recommend either immediate unsupervised or supervised visitation; he stated that "[t]he decision of when to reestablish Mr. Ferguson's supervised visitation should be made in part with information from the family therapy clinician." Ms. Rosario, an associate psychotherapist with about thirty years of experience in counseling, also counseled against immediate unsupervised or supervised visitation, asserting that visitation could take place "after [A.F. is] much more mature, a young adult perhaps." [12] Dr. Anderson, a licensed clinical psychologist for twenty-five years, conditioned her recommendation concerning visitation on treatment for Mr. Ferguson, consultation with his therapist, the indication of A.F.'s "treatment provider" that "she is ready to resume supervised visitation," and family therapy. [13] The court's own witness, Dr. Alford, explicitly declined to offer a view or recommendation concerning "current visitation." In her written 2003 recommendation, Dr. Alford did not recommend unsupervised visitation. Rather, she expressly advised: "To protect both child and father, it would be best to consider these visits when [A.F.] is of an age and developmental level where she can verbalize any possible untoward behavior, and where she can verbalize about the specifics of her visit with her father." In short, regardless of the weight given to the testimony of the health professionals, not one of them recommended unsupervised visitation; hence, there is no record evidence from any health professional stating that unsupervised visitation is appropriate. And, as we have said previously, "[t]he trial court may not 'arbitrarily disregard[], disbelieve[] or reject[]' an expert's uncontradicted testimony." *Prost v. Greene*, 652 A.2d 621, 629 (D.C.1995) (citing *Rock Creek Plaza–Woodner Ltd. P'ship v. District of Columbia*, 466 A.2d 857, 859 (D.C.1983)) (other citation omitted); *see also In re L.L., supra*, 653 A.2d

12. The trial court observed that Ms. Rosario was "not licensed" and that she "undertook therapy with the child with the assumption that she was the victim of abuse." As the court noted during the hearings, Ms. Rosario was not presented as an expert.

13. The trial court found "Dr. Anderson's opinion to be problematic in light of her limited (primarily record) review" and, as was the court's prerogative, concluded that "such opinion testimony is less weighty in the context of this proceeding when the expert has not had the benefit of hearing the testimony or interviewing many of the witnesses, including the parties or child." Nevertheless, the trial court qualified Dr. Anderson as an expert in clinical psychology and family abuse, and thus admitted her testimony into evidence. Based upon our reading of the record, the trial court did not characterize Dr. Anderson as *"not credible* for purposes of the motion under appeal," as Mr. Ferguson argues.

at 883 ("[W]hen a judge rejects expert testimony, 'there must be some basis in the record to support the conclusion that [that] evidence … is unworthy of belief' ") (citing *Rock Creek Plaza–Woodner Ltd. P'ship, supra,* 466 A.2d at 859).

Third, even though D.C.Code § 16–914(a)(3) directs that "[i]n determining the care and custody of a child, the best interest of the child shall be the primary consideration," the trial court did not explicitly consider the factors relevant to the best interest of the child determination, especially those appearing in § 16–914(a)(3)(E) ("the mental and physical health of all individuals involved") and (F) ("evidence of an intrafamily offense as defined in section 16–1001(5)"). Nor did the court adhere to the mandate in § 16–914(a–1) and § 16–1005(c–1) to consider the impact of such an offense on A.F.'s emotional development, in an effort to ascertain what was in the best interest of A.F. Instead, the court fixed on (1) whether A.F.'s "new allegations are in fact true," casting considerable doubt on the child's veracity (without expressly reversing its earlier finding that Mr. Ferguson sexually abused his daughter); (2) trying to figure out the reasons why A.F. would make such new allegations, and suggesting that she might "sense[] her mother's dislike for her father," or that she "is angry at her father for not visiting," or is reacting to the "hostility and mistrust" between her parents, all without specific reference to any of the psychological literature discussed by Dr. Anderson during her testimony, or even to the testimony of the other health professionals. As such, the court's order lacks "a firm factual foundation." *In re T.L., supra,* 859 A.2d at 1090, and seriously understates "[t]he heightened importance of proof of physical abuse [of Ms. Wilkins and A.F. by Mr. Ferguson], and its relevance to issues central to the decision of who should be entrusted with the primary care [and unsupervised visitation] with [A.F.]." *Prost, supra,* 652 A.2d at 632.

Accordingly, for the foregoing reasons, we reverse the December 15, 2005 order of the trial court granting Mr. Ferguson unsupervised visitation with A.F.

*So ordered.*