*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 20-FM-0484, 21-FM-0384 & 21-FM-0385

C.C., APPELLANT,

v.

G.D., APPELLEE.

Appeals from the Superior Court of the
District of Columbia
(2018-DRB-002060)

(Hon. Carmen G. McLean, Trial Judge)

(Argued May 10, 2022                                        Decided August 15, 2024)

*Matthew B. Andelman* for appellant.

*Gregory R. Nugent* for appellee.

Before MCLEESE, DEAHL, and HOWARD, *Associate Judges*.

HOWARD, *Associate Judge*: After his divorce proceedings began, G.D. took one of his children, A.D., to see A.D.'s grandparents, who lived just north of New York City.[1] Just as A.D. was about to spend the weekend with his mother, C.C., as

---

[1] Because this appeal concerns a termination of parental rights, we have used initials instead of names to refer to individual persons who are parties.

scheduled between the parties, G.D.'s great-aunt passed away. G.D. decided to keep A.D. to attend the funeral, but A.D. did not want to stay with G.D. and attend his great-aunt's funeral. So that Saturday morning, while G.D. was picking up bagels, C.C. came and picked A.D. up, which A.D.'s grandmother witnessed. Upon learning this, G.D. emailed C.C. asking: "Where are you taking [A.D.]? What are you thinking?" An hour later, C.C. replied that she was driving A.D. back to the District of Columbia.

This incident was part of a divorce and custody matter that started in 2018, and was later governed by a pendente lite agreement (adopted by the trial court as a consent order) for nearly two years. It was tried beginning in 2019, concluding in 2020 due in part to the COVID-19 pandemic. We now consider four issues presented by the case.

First, we consider whether the described incident was an act of parental concealment.[2] *See* D.C. Code § 16-1022(a). While the trial court found that the parental concealment subsection had been violated, we determine that the plain meaning of concealment does not support that conclusion.

---

[2] While the trial court called the incident an "act of parental kidnapping," we use the term "parental concealment" when referring to Section 16-1022(a).

Second, we consider whether the trial court acted within its discretion when it found C.C. in contempt for not following a dispute resolution provision from the parties' Consent Order, including when the court imposed a $3,000 fine for not doing so. We conclude that the trial court acted within its discretion to enforce a dispute resolution process to which both parties consented. And we disagree with C.C. that the trial court's order amounted to a finding of criminal rather than civil contempt since, among other reasons, the fine served a compensatory purpose.

Third, we consider whether the trial court abused its discretion when it required both parties to pay for private school tuition for A.D.—who was attending a public school at the time of the trial—without making adequate findings. We agree with C.C. and, in turn, we remand the trial court's findings of child support.

Fourth, we consider whether the trial court appropriately awarded attorney's fees and costs. We vacate the trial court's awards of attorney's fees and costs related to the trial court's conclusions of law on child custody and child support and to the temporary custody motions, but affirm the awards of attorney's fees and costs that relate to G.D.'s contempt motions.

## I.    Background[3]

C.C. and G.D. married in 2006.  Over time, their marriage became fraught with conflict, and the two separated in June 2018.  Following their separation, C.C. and G.D. did not reach a pendente lite temporary custody agreement over their two children, R.D. and A.D., until October 2018.  The summer before their agreement, however, a custody dispute emerged between the parents.

### A.    C.C. Picks Up A.D.

During the week of July 30, 2018, A.D. went to a camp at the Bronx Zoo in New York City.  While at the camp, A.D. stayed with his paternal grandparents in New Rochelle, New York.  G.D. had planned to attend the end-of-camp event with A.D. on Friday, August 3, and had told C.C. in a July 26 email that "[t]he children will come back to you on Saturday, 4 August."[4]

---

[3] "[W]e defer to the trial court's findings of fact unless they are 'plainly wrong or without evidence to support [them].'" *Saxon v. Zirkle*, 97 A.3d 568, 571 (D.C. 2014) (second alteration in original) (quoting D.C. Code § 17-305(a)).

[4] The trial court acknowledged that, despite conflicting accounts as to whether A.D. was supposed to transfer to C.C.'s custody on August 4 or August 6, "what is undisputed is that [A.D.] was not supposed to transfer to C.C.'s custody the morning of August 4th."

Later that week, G.D. changed these plans when his great-aunt passed away. Her funeral was set for that Sunday, August 5, in Boston. On Friday, August 3, G.D. went to New York. When he arrived, G.D. told A.D. that they would not be returning home to Washington, D.C. the next day; rather, they were going to Boston to attend the funeral. A.D. became upset and asked to call his mother. A.D. talked on the phone for less than twenty minutes with C.C.

The next morning, Saturday, August 4, G.D. left his parents' house to get some bagels for breakfast. A.D. was supposed to go with G.D., but C.C. called. While still on the phone, A.D. told his father to go without him. G.D. left the house, with A.D. in his grandparents' care.

After G.D. left, A.D. told his grandmother that he needed some fresh air and went out the back door. A.D.'s grandmother then saw C.C.—who had driven up earlier that morning from D.C.—get out of her car, hug A.D., and drive away with him. The child's grandmother called G.D. and told him that C.C. came and picked A.D. up. G.D. then emailed C.C. at 8:42 a.m., stating: "[C.C.], What are you doing? Where are you taking [A.D.]? What are you thinking?"

An hour later, C.C. replied by email. She wrote about how A.D. had been upset at having to attend the funeral:

> As you know, [A.D.] was crying a lot last night when he was talking on the phone with me. He said that he told you that he wanted to go back to DC to see me and not go to the funeral for [his great aunt]. In response, you apparently told him something to the effect of, "Too bad. Going to the funeral is more important than seeing your mom."
>
> Toward the end of the phone call, [A.D.] asked me to come and pick him up last night, and I told him that I would be there as soon as possible.

The trial court later concluded that "[a]t no point between [A.D.]'s call to C.C. Friday night and her picking him up Saturday morning in New York did C.C. ever attempt to communicate with G.D. regarding her desire and/or plans to pick up [A.D.]."

## B. The Consent Order and Motions for Contempt

Three days later, on August 7, 2018, G.D. filed an emergency motion for pendente lite legal and physical custody and requested a same-day hearing. The trial court denied the request for the same-day hearing and denied the emergency motion as moot, but advised the parties about the District of Columbia's parental concealment law.

About two months later, on October 9, G.D. and C.C. engaged a parent coordinator and agreed to a temporary custody arrangement entitled "Pendente Lite Agreement Regarding Child Custody and Certain Interim Financial Issues"

("Agreement"). The Agreement set forth a calendar through January 2019 for physical custody of R.D. and A.D.; the parties would then maintain a fifty-fifty arrangement during the rest of the school year and develop a summer schedule with the help of the parent coordinator.

The Agreement also contained a dispute resolution process. If "any dispute ar[ose] concerning either child, including any dispute over interpretation or implementation of the physical custody schedule or any other decision that substantially affects a child's general welfare," either G.D. or C.C. could request assistance from Rebecca Snyder, the parent coordinator "who was selected mutually by [G.D.] and [C.C.] to resolve such disputes." Paragraph 4.5.2 of the Agreement further provided that, "[i]f a party fails to timely meet with the [parent coordinator] within the time period for consultation, the other party shall be entitled to make the decision on the subject in dispute, which shall be binding unless and until it is overturned by a court of competent jurisdiction."

About two weeks after G.D. and C.C. signed the Agreement, the trial court entered a consent order adopting the Agreement ("Consent Order"). The Consent Order ultimately formed the basis for three motions for contempt filed by G.D.

The first motion arose as the parties attempted to develop a custody schedule for the fall of 2019. G.D.'s counsel sent a letter to C.C.'s counsel on September 12,

2019, arguing that C.C. refused to meet with the parent coordinator over a custody schedule and so triggered the Agreement's dispute resolution process. G.D.'s counsel also applied Paragraph 4.5.2 and set forth a custody schedule. Two days later, G.D. filed a motion for contempt, arguing that another paragraph concerning mediation applied. On October 7, as the parties were preparing for trial, the trial court found C.C. in contempt—holding that the dispute resolution process applied— and provided that C.C. could purge her contempt by following the custody schedule set forth in the September letter. The next week, trial began. Trial continued for four more days, and by November 14, the parties were awaiting the court's findings and order.

Meanwhile, the grounds for the Second Motion for Contempt arose since the September letter had not addressed custody schedules after January 2020. G.D.'s counsel wrote C.C.'s counsel on December 15, 2019, to set a meeting with the parent coordinator to discuss a schedule. About two weeks later, on December 31, 2019, G.D.'s counsel wrote a letter alleging that C.C. refused to meet with the parent coordinator. Invoking the dispute resolution provision under Paragraph 4.5.2, G.D. set forth a custody schedule and terms concerning the children's usage of devices like computers, tablets, and cell phones. The custody schedule and device usage formed the basis for the second motion for contempt. In her opposition, C.C. contended that she had submitted a proposed physical custody schedule on

November 1, 2019, and the parties were awaiting the court's decision after the most recent hearing on November 14. On March 5, 2020, about two months after G.D. filed his motion, the trial court set an additional trial date to address the motions.

Then, in light of the COVID-19 pandemic, the court continued that date to June 8, 2020. The court also ordered that "all other aspects of *Pendente Lite* Consent Order Regarding Custody and Support, issued October 19, 2018, as modified by the Court's Order Granting Motion for Contempt, issued October 7, 2019 (collectively, "Custody Orders"), shall remain in full force and effect." In addition, the court put the parties "on notice that if the Court determines that either party is in contempt for failure to follow the provisions of this Order or the Court's Custody Orders, they may be fined as much as $500 for each such instance of contempt." G.D. had also filed a motion for temporary legal custody, which the trial court granted.

The next month, G.D. filed the Third Motion for Contempt. Arguing that C.C. had "failed to engage in the Parent Coordination process within the two week window as set forth in the *Pendente Lite* Consent Order," G.D. alleged six custodial violations between March 27 and April 14, 2020. C.C. contended that she had called for a meeting three days after the December 31 letter and had met with the parent coordinator. She also contended that G.D. had not pointed to a "clear and unambiguous" or "'specific and definite' portion" of the Consent Order as required

to hold her in contempt. The court reserved the second and third motions for contempt for trial.

### C. The Trial Court's Findings

On July 1, 2020, and following seven days' worth of proceedings and a hearing with the children, R.D. and A.D., the trial court issued its Findings of Fact, Conclusions of Law, and Judgment of Absolute Divorce. As relevant to this appeal, the trial court awarded G.D. sole custody; ordered C.C. and G.D. to split private school tuition for both children pro rata based on their gross income; and found C.C. in contempt on the two pending contempt motions filed by G.D.[5]

To reach its child custody finding, the trial court first noted that parents enjoy a rebuttable presumption that joint custody is in the best interest of a child unless rebutted by a finding of an intrafamily offense, child abuse, child neglect, or parental kidnapping. *See* D.C. Code §§ 16-914(a)(2), (a-1). The trial court then concluded that C.C. had committed a parental concealment on August 4, 2018. D.C. Code § 16-1022(b) did not apply because with no custody order in place, both C.C. and G.D. were "relatives" of A.D., but the trial court found instructive this court's

---

[5] The trial court also made conclusions with respect to two disputed issues of distribution of marital property and debt that are not at issue in this appeal.

decision in *Fleet v. Fleet*, 137 A.3d 983, 987 (D.C. 2016), which the trial court interpreted to conclude that "interference with the custody of a minor child for a matter of minutes and while remaining in the vicinity of the custodial parent, if out of direct line-of-sight, constituted parental kidnapping under [section] 1022(b)(1)." Since the trial court concluded C.C. committed actions that constituted parental concealment and intrafamily offenses, and joint custody was not necessary to continue C.C.'s relationship with the minor children, the trial court determined that awarding sole legal custody and sole physical custody to G.D. and substantial visitation to C.C. was in the best interest of the children.

Next, to reach its child support finding, the trial court first observed that the parties' combined gross annual income exceeded $240,000, meaning that the District of Columbia Child Support Guidelines did not apply. *See* D.C. Code § 16-916.01(h). Earlier in its findings, the trial court had noted that R.D., who had Attention Deficit Hyperactivity Disorder and "behavioral issues stemming from difficulty managing her emotions," started attending a private school that would address her needs. The parties agreed on splitting the cost of R.D.'s private school tuition pro rata based on their gross income, but disagreed on whether C.C. should be credited for a withdrawal from the couple's home equity line of credit or on whether G.D. should be credited for prior tuition payments he claimed to have made. The trial court declined to credit either of them. The trial court then concluded that

"[b]eginning the 2020-2021 school year and continuing through high school, the parties will split private school tuition *for both children* pro rata based on their gross income so long as the tuition for each child is not greater than 10% higher than the then current tuition amount" (emphasis added) for the school R.D. had recently started attending.

On the Second Motion for Contempt, the trial court found C.C. in contempt for "(1) violating the PL Agreement with respect to dispute resolution regarding the 2020 schedule[]; (2) violating the PL Agreement with respect to dispute resolution regarding device usage; and (3) not returning [R.D.] to [G.D.]'s custody between December 28 and 30, 2019." The trial court observed that its October 7, 2019, order put the parties "explicitly . . . on notice" that the way to resolve custody disputes was to mutually agree in writing to any changes or employ the Consent Order's dispute resolution process. The court found, further, that C.C. "did not adequately respond to G.D.'s attempts to schedule a meeting with the [parent coordinator] about the 2020 schedule for at least two weeks," and that the "schedule set forth in the December 31 Letter should have controlled" until the trial court awarded G.D.

temporary sole custody on May 19, a few weeks prior to trial.[6]  Regarding device usage, the trial court determined that on December 9, 2019, G.D. requested to meet with C.C. about a specific incident that occurred with R.D. and the parties' need to agree upon rules for R.D.'s use of her two cell phones.  Although C.C. pointed to meeting with the parent coordinator on December 5 and emailing on December 10 to discuss issues related to R.D.'s cell phones, the trial court found that C.C. had ignored the December 9 email and its concerns; this violated the Consent Order's dispute resolution provision.

On the Third Motion for Contempt, the trial court found C.C. in contempt for six violations of custodial time.  Like it had for the second motion, the trial court concluded that its October 7, 2019, order gave notice that the parties were to use the Consent Order's dispute resolution process.  The court allowed C.C. to purge her contempt from the two motions by following the custody schedule it set forth in its

---

[6] The trial court also found C.C. in contempt for a "Willful Interference with [G.D.]'s Custodial Time" for picking up R.D. on December 28 while failing to notify G.D.  On appeal, C.C. has not challenged her contempt finding with respect to picking up R.D. on December 28, 2019.

Findings of Fact and Conclusions of Law. Separate from the purge provision, the court fined her $500 for each violation, totaling $3,000 for six violations.[7]

### D.    Attorney's Fees

After the trial court issued its Findings of Fact and Conclusions of Law on July 1, 2020, G.D. moved for attorney's fees on July 15, 2020. As ordered in the court's Findings of Fact and Conclusions of Law, G.D. moved on July 31, 2020, for attorney's fees for the first, second, and third motions for contempt and for his May 15, 2020, motion to supplement the record and for temporary custody and supervision. G.D. sought $206,605.32 in attorney's fees and costs.[8] C.C. opposed

---

[7] C.C. was ultimately ordered to pay $2,500 since the trial court also found G.D. in contempt for a conversation with R.D. related to the litigation and subtracted the $500 G.D. owed for his violation. G.D. has not challenged that finding in this appeal.

[8] The $206,605.32 that G.D. sought included: $1,760.00 from his unopposed October 2019 fees affidavit (related to his First Motion for Contempt); $155,326.30 from his July 15, 2020, fees motion (which broke down to $151,980.00 for attorney's fees and $3,346.30 for costs); and $49,519.02 from his July 31, 2020, fees motion (which broke down to $4,235.00 for fees on his Second Motion for Contempt; $1,925.00 for fees on his Motion to Temporarily Modify Legal Custody; $2,365.00 for fees on his Third Motion for Contempt; $39,985.00 for fees on his Motion to Supplement the Record, trial work, and post-trial work; and $1,009.02 in combined costs).

the motion and filed her own unopposed motion for attorney's fees related to her June 6 motion for contempt.

On May 19, 2021, the trial court awarded G.D. $142,570.46 in attorney's fees and costs—granting a percentage of G.D.'s total request and subtracting an award against G.D. The trial court applied the necessaries doctrine, under which a trial court may award attorney's fees as reimbursement for "when counsel must be engaged to protect a minor's welfare." *Paine v. Paine*, 267 A.2d 356, 357-58 (D.C. 1970). The court then proceeded with our two-part test from *Steadman v. Steadman*, 514 A.2d 1196, 1200-01 (D.C. 1986) (per curiam), deciding first "whether to award a fee," and, second, how much to award.

First, the trial court decided to award a fee after granting all three of G.D.'s motions for contempt, finding that C.C. had engaged in a parental concealment, and finding that without "recount[ing] every action that led to additional burden in this case," the litigation had been "oppressive and burdensome," *see id.* at 1200 (citations omitted), to G.D. Second, the trial court considered the nearly thirty-year experience of G.D.'s attorney; the necessity of having counsel in this matter; the effectiveness of counsel in achieving success on G.D.'s motions for contempt and sole legal and physical custody; and C.C.'s ability to pay, based on her gross annual salary of $210,000. Regarding C.C.'s ability to pay, the court noted her concerns in light of

her $1.645 million in debts, but also that nearly a third of her debts were to her father and that she had recently changed employment from government to a "significantly more lucrative position" and could do so again if need be.

The trial court agreed with C.C., however, that G.D. had "simply dumped two years' worth of billing entries" and had included costs unrelated to the context of custody. The court reduced G.D.'s award to only 70% of the amounts listed on his invoices, or $143,391.72. For her motion for contempt, C.C. was awarded $2,581.26 in attorney's fees and costs. After deducting the award to C.C., the court ultimately awarded G.D. $142,570.46.

C.C. timely appealed.[9]

## II.    Discussion

First, we review the trial court's determination that C.C. concealed A.D. from G.D. on August 4, 2018. Second, we analyze the trial court's contempt rulings, which stemmed from the dispute resolution process in the Consent Order and the trial court's imposition of a $3,000 fine. Third, we consider whether the trial court made findings sufficient to support its requirement that child support include private

---

[9] On June 28, 2021, this court sua sponte consolidated appeals 21-FM-0384, 21-FM-0385, and 20-FM-0484.

school tuition for A.D. Fourth, while we vacate and remand the awards of attorney's fees and costs on child custody and child support, we review the awards of attorney's fees for G.D.'s temporary custody motions and contempt motions.

### A. Parental Concealment

The trial court's determination of child custody stemmed from its finding of a parental concealment, which rebutted the presumption that joint custody was in the best interest of the child. *See* D.C. Code § 16-914(a)(2).

"We accord 'great deference' to a trial court's child custody determinations, which reach this court 'with a presumption of correctness.'" *Macklin v. Johnson*, 268 A.3d 1273, 1279 (D.C. 2022) (quoting *Prost v. Greene*, 652 A.2d 621, 626 (D.C. 1995); *In re C.T.*, 724 A.2d 590, 597 (D.C. 1999)). "But the trial court's use of judicial discretion must be grounded 'upon correct legal principles and must rest on a firm factual foundation.'" *Jordan v. Jordan*, 14 A.3d 1136, 1146 (D.C. 2011) (quoting *Wilkins v. Ferguson*, 928 A.2d 655, 666-67 (D.C. 2007)). Accordingly, this court reviews a trial court's legal determinations de novo and its findings of fact for clear error. *Id.* (citing D.C. Code § 17-305(a); *Wilkins*, 928 A.2d at 666).

We conclude that the record does not show that C.C. concealed A.D. from G.D. Our conclusion comes from (1) our interpretation, on first impression, of the

meaning of the phrase "intentionally conceal" in that section, and (2) our application of that meaning to C.C.'s actions.

### 1. Meaning of "Intentionally Conceal"

Section 16-1022(a) prohibits concealment: "No parent, or any person acting pursuant to directions from the parent, may intentionally conceal a child from the child's other parent." We conclude that under Section 16-1022(a), the phrase "intentionally conceal" prevents a parent from intentionally keeping a child from the child's other parent. To reach this conclusion, we consider (a) the actus reus, or required act, for concealment and (b) the mens rea, or required mental state.

### a. Actus reus

We define concealment based on (1) the plain meaning of "conceal," (2) a brief consideration of the legislative history, and (3) a comparison of Section 16-1022(a) to Section 16-1022(b)(1), and note (4) that concealment is limited by the defense of whether a child was taken for an authorized purpose.

### (1) Plain Meaning

We begin with applicable statutory interpretation principles before turning to dictionary definitions of "conceal" and legislative history.

To determine what conceal means, we "first look to see whether the statutory language at issue is 'plain and admits of no more than one meaning.'" *Wong v. District of Columbia*, 314 A.3d 1236, 1241 (D.C. 2024) (quoting *Facebook, Inc. v. Wint*, 199 A.3d 625, 628 (D.C. 2019)). "We consider not only the bare meaning of the word but also its placement and purpose in the statutory scheme." *Id.* (quoting *Yazam, Inc. v. D.C. Dep't of For-Hire Vehicles*, 310 A.3d 616, 623 (D.C. 2024)). "When the language is unambiguous and does not produce an absurd result, this court will give effect to the plain meaning." *Wong*, 314 A.3d at 1241 (internal quotation marks and citation omitted). Section 16-1022(a), however, does not define "conceal."

"When the statute does not define the term in question, 'it is appropriate for us to look to dictionary definitions to determine its ordinary meaning.'" *Lucas v. United States*, 305 A.3d 774, 777 (D.C. 2023) (brackets omitted) (quoting *Tippett v. Daly*, 10 A.3d 1123, 1127 (D.C. 2010) (en banc)). The *Oxford English Dictionary* defines "conceal" as "[t]o keep (information, intentions, feelings, etc.) from the knowledge of others; to keep secret *from* (formerly also *to*) others; to refrain from disclosing or divulging." Conceal (v.), *Oxford English Dictionary* (July 2023), https://doi.org/10.1093/OED/9641948006; https://perma.cc/PPU7-PYVD. *Merriam-Webster's Collegiate Dictionary* defines "conceal" as "to prevent disclosure or recognition of" or "to place out of sight." Conceal, *Merriam-Webster's*

*Collegiate Dictionary* 257 (11th ed. 2014). *Black's Law Dictionary* defines concealment as "[t]he act of preventing disclosure or refraining from disclosing," or "the act of removing from sight or notice; hiding." Concealment, *Black's Law Dictionary* (11th ed. 2019). These definitions suggest that when Section 16-1022(a) states that a parent may not "intentionally conceal a child from the child's other parent," that section prevents a parent from hiding a child from the child's other parent.

### (2)    Legislative history

In particular, a focus on the concealment of the location of the child appears to be supported by the legislative history. *See Yazam*, 310 A.3d at 623 (citing *In re Macklin*, 286 A.3d 547, 553 (D.C. 2022)) ("We may also look to the legislative history to ensure that our interpretation is consistent with legislative intent."). The Council of the District of Columbia added Section 16-1022(a) as part of the District of Columbia Parental Kidnapping Prevention Act of 1985. *See* District of Columbia Parental Kidnapping Prevention Act of 1985, D.C. Council, Report on Bill 6-311 at 2 (Dec. 4, 1985). Officials had been "unable to take action against a parent who has deprived the other parent of child custody through abduction, concealment, and detention of the child." *Id.* In turn, the Act made it "a crime for a parent to intentionally conceal the child from the other parent." *Id.*

The Committee on the Judiciary considered the subsection adopted as Section 16-1022(a) as "important and effective since in many cases there is simply no proof of the child's whereabouts." *Id.* In the Committee's summary of public testimony about the proposed act, for example, Janet Kosid, Director and Legal Technical Assistant for the National Center for Missing and Exploited Children, advocated for making the concealment offense a felony because "it would be easier to obtain federal assistance in *locating the child*." *Id.* at 8 (emphasis added). The Committee added a felony provision accordingly, which the Council adopted. *See id.* at 5.

To be sure, the trial court here correctly pointed out that the legislative history "do[es] not shed light on minimum qualifications of what constitutes concealment." Still, given that the Council considered cases about a child's whereabouts and designed penalties to facilitate locating a concealed child, we think it reasonable to conclude that the Council focused on the act of hiding a child. For the purposes of this decision, we assume without deciding that a parent could conceal a child under Section 16-1022(a) by hiding information about a child's whereabouts.[10]

---

[10] To clarify what hiding information about a child's whereabouts looks like, imagine that Parents A and B have a child in common; the child runs away and informs Parent A of their location; Parent B then asks Parent A, who declines to tell Parent B. Because this appeal concerns a dispute over whether C.C. actually hid A.D. from G.D., we reserve judgment on whether a denial of information alone would qualify as concealment.

### (3)     Statutory scheme and case law

We "do not read statutory words in isolation" nor consider only the "bare meaning" of a word. *Yazam*, 310 A.3d at 623 (quoting *Macklin*, 286 A.3d at 553). Rather, we consider a word's "placement and purpose in the statutory scheme," since the meaning of a word or phrase may only become evident in its context. *Id.* Here, we first consider how "conceal" in Section 16-1022(a) differs from the language of Section 16-1022(b)(1), which the trial court here relied upon. We then explain why we decline to analogize to *Fleet*, 137 A.3d at 987, which applied Section 16-1022(b)(1), and instead look to cases from other jurisdictions concerning concealment.

Section 16-1022 prohibits two types of acts. Unlike Section 16-1022(a), which prohibits concealment, Section 16-1022(b)(1) prohibits a relative[11] (or person acting under a relative's directions) who "knows that another person is the lawful custodian of a child" from "[a]bduct[ing], tak[ing], or carry[ing] away a child with the intent to prevent a lawful custodian from exercising rights to custody of the child." The bottom line is that under Section 16-1022(a), a parent may not conceal a child from the other parent; under Section 16-1022(b)(1), whether a parent has

---

[11] A relative "means a parent, other ancestor, brother, sister, uncle, or aunt, or one who has been lawful custodian at some prior time." D.C. Code § 16-1021(4).

abducted, taken, or carried away a child turns in part on whether the parent has lawful custody of a child. *See also Khawam v. Wolfe*, 214 A.3d 455, 461 (D.C. 2019) ("*Khawam II*") (quoting *Martin v. Tate*, 492 A.2d 270, 273 (D.C. 1985)) ("[I]n the absence of a custody decree, each parent has an equal right to the custody of his or her children.").

In turn, we agree with C.C. that "intentionally conceal" in Section 16-1022(a) contrasts with what Section 16-1022(b) prohibits: parental kidnapping from a lawful custodian. Under Section 16-1022(b), a relative may not "[a]bduct, take, or carry away a child," *see* D.C. Code §§ 16-1022(b)(1)-(2); "keep," "with intent to harbor, secrete, detain, or conceal the child or to deprive a lawful custodian of the physical custody of the child," *see* D.C. Code § 16-1022(b)(3); "conceal, harbor, secrete or detain the child," *see* D.C. Code §§ 16-1022(b)(4)-(5); or "take or entice the child," *see* D.C. Code § 16-1022(7)-(8). Unlike Section 16-1022(a), which prohibits hiding a child, Section 16-1022(b) prohibits a relative from taking away, carrying, or harboring a child. Both involve denial of a parental right to a child, but are meaningfully different.

That difference explains why we decline to extend our rationale from *Fleet v. Fleet*, a Section 16-1022(b)(1) case, to apply to concealment under Section 16-1022(a). In *Fleet*, we determined that a father intended to prevent his child's

mother—the lawful custodian—from exercising custody rights when he took the child out of the mother's car and into his office building. 137 A.3d at 985, 987. It did not matter that the father only "briefly" took the child into the office building before surrendering the child to police. *Id.* at 987. Analogizing to the general kidnapping statute, we concluded that Section 16-1022(b)(1) contains no requirement that a child "be moved any particular distance or held for any particular length of time" for a parent to have committed a kidnapping.[12] *Id.* (quoting *Richardson v. United States*, 116 A.3d 434, 439 (D.C. 2015)). We declined, however, to address concealment under Section 16-1022(a) because we found a parental kidnapping had occurred under Section 16-1022(b)(1).

If anything, *Fleet* suggests that kidnapping and concealment differ. In *Fleet*, the trial court had held that the father concealed the child under Section 16-1022(a) because the child was not in the mother's line of sight when the father took the child into his office. *See id.* at 994 n.5 (Ruiz, J., dissenting). But the dissent observed that the father walked "for only a few seconds" behind the car before going into his

---

[12] Recently, this court concluded in *Cardozo v. United States* "that to hold or detain somebody in the context of the kidnapping statute means to detain them against their will for a *substantial period of time*, so that the perpetrator could fairly be described as holding another captive like a hostage or a prisoner." 315 A.3d 658, 676 (D.C. 2024) (emphasis added). We do not have occasion here to address what implications, if any, *Cardozo* may have for *Fleet*.

"glass-fronted" office building. *Id.* There was "no reason to doubt" that the mother knew where the child was. *Id.* To contrast the facts of *Fleet* from a "common-sense understanding of what it means to conceal in the context of kidnapping," *id.* (internal quotation marks omitted), the dissent then pointed to two cases.

Those cases suggest to us that a common sense understanding requires us to distinguish the requirements of parental kidnapping from the requirements of concealment. In *People v. Manning*, an Illinois appeals court determined that conceal means to "hide or keep from observation, discovery, or understanding; keep secret." 778 N.E.2d 1222, 1227 (Ill. App. 2002). After a defendant took a child out of state and out of the country without notifying the mother for fourteen days, the appeals court concluded that a jury could reasonably have inferred an intent to conceal. *Id.* Using similar language, a Minnesota appeals court reversed a conviction for concealing a minor child after a mother refused to allow police officers to enforce a father's visitation time with his children. *State v. Fitman*, 811 N.W.2d 120, 122-23 (Minn. Ct. App. 2012). That court concluded that "[c]oncealing children requires actively hiding them or attempting to keep another from discovering their whereabouts." *Id.* at 123. There was no evidence that the mother hid the children or "intentionally prevented" the father from seeing the children or knowing where they were. *Id.*; *see also State v. Johnson*, 979 N.W.2d 483, 496-97 (Minn. Ct. App. 2022) (reversing concealment conviction where a

mother who retained a child to obtain medical treatment did not intend to hide the child because, while not responding to a father's emails and calls, she uploaded a picture of the child at an emergency room to social media and "tagged" the child). Like our concealment statute, the Minnesota concealment statute was passed alongside other provisions that criminalized taking, obtaining, retaining, or failing to return a child from or to the child's parent or rightful custodian. *Fitman*, 811 N.W.2d at 124. In turn, the court concluded that "the legislature saw concealing a child as separate from, not synonymous with, taking, obtaining, retaining, or failing to return a child." *Id.* at 124. When it comes to sections 16-1022(a) and 16-1022(b), we adopt the same distinction.

### (4)  Defenses to concealment

Finally, we observe that a limit on the scope of concealment comes from whether a child was taken for an authorized purpose. Neither sections 16-1022(a) nor 16-1022(b) are violated if a child is taken to protect them from imminent physical harm, to protect a parent fleeing imminent physical harm, with the consent of the other parent, or if the taking was "otherwise authorized by law." *See* D.C. Code §§ 16-1023(a), (a)(3), (a)(4); *see also* Report on Bill 6-311 at 3. We do not expand upon authorized purposes beyond what Section 16-1023(a)(4) offers, but confirm the "general principle that a factfinder may infer that people intend the

natural and probable consequences of their acts knowingly done." *Fleet*, 137 A.3d at 988; *cf. id.* at 995 (Ruiz, J., dissenting) ("The short time and distance involved in this case, along with the circumstances as a whole, say a lot about Mr. Fleet's intent when he briefly moved the child to his office in response to Ms. Fleet's untoward action and angry outburst."). While whisking a child across state lines without the knowledge of the other parent could be considered concealment if the other parent sought the child, hiding a child under a table for a surprise party for the other parent, for example, would not be.

We acknowledge the difficulty that a factfinder faces in a scenario—like this case—where there is no order defining the parents' joint custodial authority. In such scenarios, which are common in the pendente lite context, consent of the other parent is generally not needed. *Cf. Albergottie v. James*, 470 A.2d 266, 270-71 & 270 n.7 (D.C. 1983) (noting that in the absence of custody order, and although father's taking of child from South Carolina to D.C. under false pretenses was "wrongful," trial court correctly declined to exercise jurisdiction over custody dispute because both parents had a right to custody). For example, in a pendente lite context, a parent might take a child on an overnight camping trip without the other parent's consent. But without a governing custody order and with an applicable presumption of joint custody, the parent might be authorized to take the child on the trip even against the other parent's wishes, and even if the other parent does not know exactly where the

child is all weekend. And in such a context, as parents exercise joint parental custody, the parents are likely not required to give each other complete information about the precise location of the child at all moments, even if the other parent has requested that information. In such contexts, a factfinder must weigh the parents' conflicting rights to determine whether a parent acted to intentionally conceal a child, let alone whether that concealment was for a purpose not otherwise authorized by law.

### b.      Mens rea

Section 16-1022(a) prevents a parent or person acting under a parent's directions from "*intentionally* conceal[ing] a child from the child's other parent" (emphasis added). We conclude only that under Section 16-1022(a), a parent must intend to conceal a child.

\*      \*      \*

To sum up, for a parent to violate Section 16-1022(a), we determine that a parent must intentionally keep the location of the child secret from the child's other parent.[13]

## 2. Application to C.C.'s Actions

Based on the meaning of concealment under Section 16-1022(a), we cannot conclude that C.C. concealed A.D. Our conclusion rests on two sets of circumstances: first, that the record does not appear to show that C.C. kept A.D.'s location secret from G.D., and second, that C.C. and G.D. were not obligated to keep each other continually apprised of A.D.'s location due to their equal custodial rights at the time of the incident.

---

[13] C.C. also argues that the "parental kidnapping statute . . . must be found to be impermissibly vague" under the Due Process Clause because it restricts a parent's pre-custody-order right to "exercise physical custody over her child." But she has not provided briefing sufficient for us to examine the constitutionality of sections 16-1022(a) or 16-1022(b), and we have repeatedly noted that "[i]t is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." *Johnson v. District of Columbia*, 225 A.3d 1269, 1276 n.5 (D.C. 2020) (quoting *Gabramadhin v. United States*, 137 A.3d 178, 187 (D.C. 2016)).

### a. Whether A.D.'s location was kept secret

As an initial matter, we conclude that C.C. did not keep A.D.'s location secret from G.D. Two reasons explain why.

First, the fact that C.C. had picked up the child was not a secret. A.D.'s grandmother saw C.C. get out of her car, hug A.D., and drive away with him. As G.D. testified, he learned that C.C. picked up A.D. when the child's grandmother called G.D. and said, "there's no need to get a bagel for [A.D.], his mom's picked him up." This suggests that within minutes of C.C. picking up A.D., G.D. appears to have known A.D. was with C.C.

Second, it was not a secret that C.C. was taking A.D. back to the District of Columbia. After learning A.D. was with his mother, G.D. then emailed C.C.; an hour later, C.C. replied, "[A.D.] told you that he wanted to go back to DC to see me," "asked me to come and pick him up," and that she "told [A.D.] that I would be there as soon as possible." While "shocked" at A.D. being whisked away, G.D. does not appear to have lacked information about where A.D. was. And G.D. does not appear to have suggested that he lacked information about the fact that A.D. was heading home to the District—where C.C. was originally slated to have custody of A.D. for that weekend. The bottom line is that even if C.C. intended to conceal A.D., she failed to do so.

### b. Whether C.C. and G.D. were obligated to keep each other continually apprised of A.D.'s location

Another circumstance that counsels against a conclusion that C.C. concealed A.D. is the fact that C.C. and G.D. had equal custodial rights at the time of the incident. Recall that on August 4, 2018, just a month after their divorce proceedings began, C.C. and G.D. had yet to reach a pendente lite temporary custody agreement (and would not reach one until about two months later). In that interim period, they had equal custodial rights: as the trial court would later correctly conclude, Section 16-1022(b), the parental kidnapping statute, could not apply. In turn, C.C. and G.D. were not obligated to keep each other continually apprised of A.D.'s location to the point where the brief delay in C.C. responding to G.D.'s email constituted an act of concealment.

This reasoning explains why we disagree with the trial court's reliance on two of C.C.'s acts to constitute its concealment finding. First, the trial court noted that "[C.C.] made no effort to inform [G.D.] or his parents of the minor child's whereabouts or *even that he was safe*." But neither the text of Section 16-1022(a) nor the plain meaning of "conceal" require an affirmative act of communication, let alone when parents have equal custodial rights in the absence of a pendente lite or final custody order. Second, the trial court also focused on C.C.'s failure to respond to G.D. for an hour after she picked up A.D., but C.C.'s brief delay in responding

was understandable. To underscore this point, C.C. was driving and G.D. contacted her via email—not via a more immediate method such as phone call. Of course, we hope that a driver would not be actively checking emails or texting while driving. More to the point, the fact that G.D. sent an email comes across as odd. While an email would more easily document the content of his communication, it also showed a lack of urgency. Despite not hearing back right away as to where A.D. was or where they were going, G.D. knew that A.D. was with C.C. To these ends, we disagree with the trial court's reasoning that C.C. violated Section 16-1022(a) because her actions may have been "consistent with the conduct that the spirit of . . . Section 16-1022(b) intends to prohibit."

To be sure, like the court in *Fitman*, we "do not suggest that a parent's knowing merely the general whereabouts of the child (e.g., the child is somewhere in Minnesota)" would preclude a finding of concealment. *See* 811 N.W.2d at 124 n.3. "However, when the parent knows the exact location of the child, an element . . . has not been met." *Id.* Of course, G.D. did not know precisely where A.D. was for about an hour. But we decline to read into Section 16-1022(a) a durational requirement for notifying the other parent—let alone to read into the statute such a requirement in a joint custody scenario like the one here. That lack of a durational requirement further informs our conclusion that the trial court erred

when it applied *Fleet*'s principle that "interference with the custody of a minor child for a matter of minutes" could constitute concealment under Section 16-1022(a).

\*     \*     \*

In short, we cannot readily conclude here that C.C. concealed A.D. Since the trial court's concealment finding was one of the intrafamily offenses that rebutted the presumption against joint custody, we vacate and remand the trial court's custody finding.

### B.     Contempt Rulings

Under the Second Motion for Contempt, the trial court found C.C. in contempt for violating the dispute resolution process of the Consent Order, concluding she failed to engage in the process to resolve 2020 custody schedules and the children's device usage. Under the Third Motion for Contempt, the trial court found C.C. in contempt for six custodial violations in March and April 2020, and assessed a $500 fine for each instance of contempt, amounting to $3,000. We conclude that the trial court acted within its discretion when it (1) enforced the Consent Order's dispute resolution process for device usage and custody schedules, and (2) when it imposed a $3,000 fine after providing notice in its March 20, 2020, order.

### 1. Dispute Resolution Process

"To support a finding of civil contempt, a complainant must prove that the alleged contemnor (i) was subject to the terms of a court order and (ii) violated the order." *Loewinger v. Stokes*, 977 A.2d 901, 916 (D.C. 2009) (quoting *D.D. v. M.T.*, 550 A.2d 37, 43-44 (D.C. 1988)). "Because 'drastic' sanctions, up to and including conditional imprisonment and substantial fines, may be imposed upon a finding of civil contempt, proof of the alleged contemnor's violation of a court order must be made by clear and convincing evidence." *Id.* (quoting *D.D.*, 550 A.2d at 44). "The decision whether to hold a party in civil contempt is confided to the sound discretion of the trial judge and will be reversed on appeal only upon a clear showing of abuse of discretion." *Kayode v. Midas Constr., LLC*, 312 A.3d 1229, 1233 (D.C. 2024) (brackets omitted) (quoting *Eisenberg v. Swain*, 233 A.3d 13, 22 (D.C. 2020)).

C.C. mainly argues that the actions for which she was found in contempt were terms "contained in letters written by G.D.'s counsel" that the trial court treated "with the same effect as if a court had issued an order." But the terms leading to the Second and Third Motions for Contempt flowed from a dispute resolution process that both parties agreed to, and that the trial court adopted at the parties' request following the First Motion for Contempt. In turn, we conclude that the trial court

did not abuse its discretion when it enforced the dispute resolution process with respect to device usage or the custody schedules.

### a. Device Usage

We determine that the trial court acted within its discretion to interpret the terms that comprised the Consent Order, including the terms of the dispute resolution process and language that encompassed the dispute over the children's device usage.

"As a general proposition, civil contempt of a court order, including a consent decree, may be established only if the order allegedly violated is 'specific and definite,' or 'clear and unambiguous.'" *Fed. Mktg. Co. v. Va. Impression Products Co.*, 823 A.2d 513, 523 (D.C. 2003) (quoting *Sec. Exch. Comm'n v. Am. Bd. of Trade, Inc.*, 830 F.2d 431, 439 (2d Cir. 1987); *AccuSoft Corp. v. Palo*, 237 F.3d 31, 47 (1st Cir. 2001)). Courts construe ambiguities in a consent order "to the benefit of the person charged with contempt," *Fed. Mktg. Co.*, 823 A.2d at 523 (quoting *AccuSoft Corp.*, 237 F.3d at 47), and should recognize that a "consent decree is a contract that was negotiated by the parties to it as well as a court order." *Id.* To clarify the meaning of any ambiguous provisions, a trial court must "interpret ambiguous provisions, if possible, in light of what the evidence shows the parties themselves intended," and may review extrinsic evidence to do so. *Id.* "The trial court's resolution of the meaning of an ambiguous provision in light of extrinsic

evidence is a factual finding that we will not reverse unless it is plainly wrong or without evidence to support it." *Id.* (citing *Waverly Taylor, Inc. v. Polinger*, 583 A.2d 179, 182 (D.C. 1990)).

This means that, for the most part, we defer to our trial court colleagues to resolve any disputed meanings of a decree or order. In *Federal Marketing Co. v. Virginia Impression Products Company, Inc.*, we upheld a trial court's interpretation of an ambiguous provision of a consent decree that ultimately formed the basis for a finding of civil contempt because the interpretation was a "plausible reading." *Id.* at 524. A company called Virginia Impression Products ("VIP") had done business in the District of Columbia as "Federal Marketing," leading to a consent decree with Federal Marketing Company where VIP had to account "for all profits made by VIP from conducting business in the District of Columbia using Federal Marketing's name at any time." *Id.* at 519 (brackets omitted). The trial court interpreted the provision to apply only to VIP's sales or shipments to federal government offices inside the District of Columbia and not to bids for General Services Administration ("GSA") contracts or to sales for government offices outside the District of Columbia. *Id.* at 522-23. That interpretation followed other provisions that applied only to VIP's transactions inside the District of Columbia, or that favored "simplicity and brevity" and thus counseled against a broader reading of the provision at issue. *Id.* at 524. And "because the consent decree represent[ed] a compromise, its scope

c[ould ]not be discerned merely by reference to what might satisfy the purposes of one of the parties." *Id.* (internal quotation marks omitted).

Here, C.C. appears to argue that the Consent Order was not "clear and unambiguous" enough to warrant a finding of civil contempt for failing to meet with the parent coordinator to resolve disputes about device usage. Like we did in *Federal Marketing Company*, we ask whether the trial court made a plausible reading in light of the evidence before it. *Id.* at 524. Per the terms of the Consent Order, after a party requested to meet with the parent coordinator, all parties had two weeks to do so under Paragraph 4.5. If a party failed to do so, then, under Paragraph 4.5.2, "the other party shall be entitled to make the decision on the subject in dispute." G.D. emailed on December 9 and December 10, 2019, listing a number of concerns about R.D.'s device usage and requesting to meet, and, on December 11, provided four potential dates to meet. On December 15, C.C. only responded with "Rebecca, Sorry but I do not have availability for an in-person meeting at any of the time that Greg has proposed." The trial court concluded that on December 31, after two weeks had passed, C.C. had not replied to schedule a meeting about the device issues. It makes sense under Paragraph 4.5.2, then, that G.D. was entitled to make a decision about device usage that C.C. was bound—and failed—to follow.

Neither of the ambiguities C.C. points to raise concerns about whether the trial court erred in its interpretation. C.C. argues that the Consent Order was ambiguous as to when the mediation provision—rather than the dispute resolution provision—would apply. But the plain text of the mediation provision belies this argument. The mediation provision, located at Paragraph 6, applied "if a dispute arises concerning the interpretation of this Agreement, or a dispute arises concerning either party's performance under this Agreement." While the question of whether the children's use of devices fell under the dispute resolution process at Paragraph 4 might have been a question of interpretation, the actual dispute plausibly fell under the children's "general welfare" covered under Paragraph 4.5.

C.C. also argues that the device issue was a "day-to-day" decision exempted under Paragraph 4.2, which provided, "Each parent shall be entitled to make routine day-to-day decisions concerning a child when such child is in his or her care." But she makes this argument for the first time on appeal, so we decline to address that argument here.

And the record contains no contrary "extrinsic evidence," *Fed. Mktg. Co.*, 823 A.2d at 523, that counsels us to interpret the Consent Order's dispute resolution process differently. Indeed, the trial court began its ruling on the Second Motion for Contempt with the fact that the court ordered the parties to follow the dispute

resolution process related to the custody dispute that led to the First Motion for Contempt in October 2019. That fact, if anything, appears to have bolstered the trial court's reading of the dispute resolution process as applying to any dispute that might arise under the Consent Order.

We therefore decline to vacate the findings of contempt against C.C. for failing to resolve disputes on device usage through the dispute resolution process.

### b. Custody Schedules

C.C. also disputes whether she can be held in contempt for failing to engage in the dispute resolution process for conflicts over the physical custody schedules. We conclude, however, that the trial court acted permissibly in finding C.C. in contempt for the custodial violations. Below, we explain why the trial court could delegate authority to set a physical custody schedule in this particular context: violations of temporary physical custody of the children while this litigation proceeded. We then discuss why the trial court acted within its authority when it applied its contempt power.

### (1) Delegation of authority to set a physical custody schedule

For the reasons discussed above, the mutually agreed-upon dispute resolution process also applied to disputes over physical custody schedules. Of course, as C.C.

correctly points out, "a trial court may not abdicate its responsibility to decide the core issues of custody and visitation." *Jordan*, 14 A.3d at 1156 (citing D.C. Code § 16-914(a)(1)(A) ("The Court shall make a determination as to the legal custody and the physical custody of a child."); *see also Lewis v. Lewis*, 637 A.2d 70, 72-73 (D.C. 1994) (reversing trial court's grant of "complete discretion" to mother over whether children could visit father). However, in *Jordan v. Jordan*, we discerned no error in the appointment of a parent coordinator.

We made the observation that C.C. points to, rather, when the trial court appointed a parent coordinator after it had granted joint legal custody—and where it set limiting language surrounding that appointment. *Jordan*, 14 A.3d at 1144, 1151. In *Jordan*, a joint custody order was "subject to" provisions regarding issues like therapy and schooling, and to the appointment of a parent coordinator because the parties were unable to "reach joint decisions regarding the children."[14] *Id.* at 1144.

---

[14] As this court noted, "[p]arenting coordinators simplify the litigation process in highly contentious parenting situations by helping parents to reduce conflict, while decreasing their reliance on the intervention of the courts." *Jordan*, 14 A.3d at 1153 (citing Dana E. Prescott, *When Co–Parenting Falters: Parent Coordinators, Parents-in-Conflict, and the Delegation of Judicial Authority*, 20 Maine Bar J. 240, 240 (Fall 2005); Christine Coates, *et al.*, *Parenting Coordination for High–Conflict Families*, 42 Fam. Ct. Rev. 246 (April 2004)). "[T]he availability of a parent

We affirmed the trial court's appointment after determining that a parent coordinator served a function similar to that of a special master. *Id.* at 1155 (citing Super. Ct. Dom. Rel. R. 53). The order appointing the parent coordinator allowed the coordinator to make the "final determination on any issue" where the parties could not make a joint decision—and "read as a whole," the order contained key limiting language. *Id.* at 1156-57 (emphasis omitted). That language "specified that the parent coordinator may 'make decisions resolving day-to-day conflicts between the parties that do not affect the court's exclusive jurisdiction to determine fundamental issues of custody and visitation.'" *Id.* at 1156. As such, we concluded that the joint custody order did not affect the trial court's responsibility to determine custody or visitation. *Id.* We also noted that a strong argument could be made that appointment and use of a parent coordinator could be considered a condition of the award of joint custody. *See id*. at 1156 n.17 (collecting cases where trial courts have exercised

coordinator to minimize day-to-day disagreements is in the best interests of the children." *Id.*;*see also Bower v. Bournay-Bower*, 15 N.E.3d 745, 748-50 (Mass. 2014) (comparing roles of parent coordinators across jurisdictions); *Litigation of Custody Disputes Involving Use of Parent Coordinators as Improper Delegation of Judicial Authority*, 31 A.L.R. 7th art. 9, § 2 (2017) (same).

"discretion to impose conditions in awarding custody," including assigning decision-making to one party or requiring parenting classes or counseling).

Here, we conclude that the trial court did not abuse its discretion in holding C.C. in contempt for a custodial violation because the court did not impermissibly delegate its responsibility to determine custody. *Jordan* and *Lewis* concerned post-trial custody and visitation determinations, respectively; here, the order concerned temporary physical custody.[15] *See* 14 A.3d at 1143-44; 637 A.2d at 71. Notably, Paragraph 4.1 of the Consent Order stated that "[t]he parties shall have joint legal custody of the children." In addition, the proposed Consent Order—which came from language from both C.C. and G.D.—began by stating that the parties had "agreed to terms pertaining to custody of their children and financial support pendente lite . . . until a final agreement of the parties or merits determination" by the trial court. In other words, the parties knew that the Consent Order—which they

---

[15] Legal custody refers to legal responsibility for a child; physical custody refers to a child's living arrangements. *Macklin v. Johnson*, 268 A.3d 1273, 1278 (D.C. 2022) (citing D.C. Code § 16-914(a)(1)(B)(i)-(ii)). Legal custody includes a parent or guardian's rights to "make decisions regarding that child's health, education, and general welfare," access "educational, medical, psychological, dental, or other records," and "speak with and obtain information regarding the child from school officials, health care providers, counselors, or other persons interacting with the child." *Id.* (citing D.C. Code § 16-914(a)(1)(B)(i)). Physical custody includes a child's "residency or visitation schedule." *Id.* (citing D.C. Code § 16-914(a)(1)(B)(ii)).

wrote, agreed to, and asked the trial court to adopt—did not constitute a final determination of custody and that they had joint legal custody pendente lite, or until the trial court issued its final custody determination. Further, while the parties have not argued and fully briefed the point, we note as we did in *Jordan* a strong case could be made here, where decision-making between the parties was fraught, that the appointment of the parent coordinator was a condition of the award and exercise of pendente lite joint custody. We therefore cannot conclude that the trial court impermissibly delegated its authority to determine custody.

### (2) Contempt power

That delegation of authority necessarily came with the power to hold the parties in contempt for violations of temporary physical custody—a power that, we conclude, derived from three facts in this case: the parent coordinator stepping into the role of a court-appointed expert, the parties' consent, and the availability of judicial review.

To begin, this court has previously limited custody subject to a parent's engagement with a court-appointed expert. In *Hamel v. Hamel*, we upheld a trial court's order that a mother not visit with her children until she met with a court-designated psychiatrist. 489 A.2d 471, 472 (D.C. 1985). After the mother moved for a change in court-ordered custody, the trial court required the mother to meet

with the psychiatrist so that the psychiatrist could provide "assistance in properly scheduling and monitoring such visitations [with her children]"—but the court "retained ultimate authority to determine the terms and conditions of visitation." *Id.* at 474. Because courts regularly seek expert assistance in forming equitable arrangements for visitation, "it follows that the court's authority to seek expert opinion necessarily includes the power to require the parties to cooperate with such experts." *Id.* at 475 (citation omitted). Like the *Hamel* psychiatrist that evaluated a mother's progress in mental health treatments, *see id.*, the parent coordinator here provided a form of expert assistance that necessarily came with the power to require the parties to cooperate. The trial court essentially made this point when considering the First Motion for Contempt a few weeks before trial began in October 2019. There, the court explained that "although this matter is set for a seven day trial in mid-October, the permanent custody order will not be immediately available upon conclusion of the trial and, thus, it was not prudent to delay resolution of this dispute until the issuance of a permanent order." In other words, the court could require the parties to coordinate with the parent coordinator to resolve temporary physical custody issues when it adopted the Consent Order.

The parties' consent in that order was key. In *Leon v. Cormier*, a Massachusetts appeals court upheld a contempt finding where a mother had violated a mutually selected parent coordinator's series of decisions regarding email

communications and visitation. 74 N.E.3d 627, 628-30 (Mass. App. Ct. 2016). The mother and father "consent[ed] in advance to be bound by the coordinator's decisions, unless either party sought judicial review and an alternate order," *id.* at 630, and the parent coordinator's decision did not affect the "material terms" of child custody or the father's right to visitation, *id.* at 631. To be sure, our conclusion here might differ if the parties had not agreed to the Consent Order's dispute resolution process. *Compare Bower*, 15 N.E.3d at 756 (concluding that "the appointment in this case exceeded the bounds of that authority by granting the parent coordinator binding decision-making authority without the consent of a party"), *with Leon*, 74 N.E.3d at 630 ("[U]nlike in *Bower*, the judge played no role in the appointment of the parent coordinator."). But, again, the parties jointly proposed the Consent Order language that includes the dispute resolution process that C.C. now protests. And while C.C. argues with one out-of-jurisdiction case that a court "becomes bound to the powers and remedies that it could impose through its own statutory or common law authority absent an agreement," *Savage v. Thompson*, 523 P.2d 110, 113 (Ariz. App. 1974), we are unaware of any decisions that prohibit a voluntary dispute resolution process like the one here from addressing temporary physical custody.

We might conclude differently if either the Consent Order contained no provision for judicial review or if C.C. had sought judicial review of the physical custody schedule to no avail. But neither is the case here. The Consent Order

appears to have contained a provision that nodded at judicial review: "If a party fails to timely meet with the [parent coordinator] within the time period for consultation, the other party shall be entitled to make the decision on the subject in dispute, which shall be binding *unless and until it is overturned by a court of competent jurisdiction*" (emphasis added). To be sure, either that language or the court's October 7, 2019, order might have made more explicit the trial court's ultimate discretion over custody. But like how we concluded in *Jordan* that, "read as a whole," the order there contained key limiting language, *see* 14 A.3d at 1156-57, we apply a holistic reading here. The limiting language about court jurisdiction (which, again, was provided by the parties), along with the multiple references to the temporary nature of the custody arrangements, could not have left the parties in doubt as to whether the court retained ultimate authority to decide custody issues. Of course, courts in other jurisdictions have rejected delegations to parent coordinators without judicial review. *See, e.g.*, *Bower*, 15 N.E.3d at 757 (concluding that referral to parent coordinator exceeded court's inherent authority where referral occurred "in lieu of a hearing and ruling on the parties' contempt complaints"); *Warawa v. Warawa*, 587 S.W.3d 631, 636-37 (Ky. Ct. App. 2019) ("[T]he parties agreed that a parent coordinator would be used. However, that agreement did not permit the parent coordinator to be a final decision-maker without the family court conducting an independent review if requested by one of the parties."). But here,

C.C. never challenged the physical custody determinations until her opposition to the Second Motion for Contempt.

In short, the dispute resolution process governed the 2020 custody schedule, which C.C. could have resolved through the process (and which formed the basis for the Second Motion for Contempt). That process governed the six custodial violations in March and April 2020, which followed the trial court's March 20, 2020, order that the parties could be held in contempt for failing to follow the court's custody orders (and which formed the basis of the Third Motion for Contempt, as discussed below). When C.C. did not participate in the Consent Order's dispute resolution process, that same process enabled G.D. to set forth a custody schedule. We conclude, in turn, that the trial court acted within its discretion when it held C.C. in contempt.

## 2. $3,000 Fine

The Third Motion for Contempt stemmed from the trial court's factual findings of six custodial violations after its March 20, 2020, order. C.C. argues that the trial court order "turned the matter from one of constructive civil contempt into one of criminal contempt." We disagree. We conclude that the trial court's order amounted to a finding of civil rather than criminal contempt because the fine served

a compensatory purpose, was payable to G.D., sought to coerce future compliance, and was a relatively small amount.

### a. Civil and Criminal Contempt

To explain why we conclude that the trial court imposed a civil rather than criminal contempt, we give background on what underpins the contempt power of a court and what distinguishes civil versus criminal contempt.

The contempt power of a court in our jurisdiction comes in part from Congress's grant to Superior Court judges of "express authority to 'punish for disobedience of an order or for contempt committed in the presence of the court.'"[16] *Kayode*, 312 A.3d at 1233 (quoting *Eisenberg*, 233 A.3d at 22 (quoting D.C. Code § 11-944(a))). Independent of the statutory offense of criminal contempt, however, a court "retains a well-established power to punish for contempt that is inherent in the nature and constitution of a court arising from the need to enforce compliance with the administration of the law." *See id.* (internal quotation marks and ellipsis omitted); *see also Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S.

---

[16] "If the conduct constituting the contempt occurs out of the presence of the court, it may be further characterized as 'indirect' or 'constructive' contempt." *Kayode*, 312 A.3d at 1231 n.1 (quoting *Thompson v. Thompson*, 559 A.2d 311, 314 n.4 (D.C. 1989)).

821, 831 (1994) ("Courts thus have embraced an inherent contempt authority as a power necessary to the exercise of all others.") (internal quotation marks and citations omitted); *In re Robertson*, 19 A.3d 751, 761 (D.C. 2011) (explaining that under *Young v. United States*, 481 U.S. 787, 800 (1987), criminal contempt actions "sanctio[n] conduct that violates specific duties imposed by the court itself, arising directly from the parties' participation in judicial proceedings" and that the prosecution of criminal contempt need not "be considered an execution of the criminal law in which only the Executive Branch may engage"). That power necessarily comes with procedural safeguards. *See Bagwell*, 512 U.S. at 831 (observing that the "contempt power also uniquely is liable to abuse" because, "[u]nlike most areas of law, where a legislature defines both the sanctionable conduct and the penalty to be imposed, civil contempt proceedings leave the offended judge solely responsible for identifying, prosecuting, adjudicating, and sanctioning the contumacious conduct.") (internal quotation marks omitted); *see also Brookens v. United States*, 182 A.3d 123, 132 (D.C. 2018) (explaining history behind contempt power in District of Columbia courts).

Those safeguards, however, differ based on whether contempt is determined to be civil or criminal—which depends in part on the "character and purpose of the sanction" and the "character of the relief itself." *See Bagwell*, 512 U.S. at 827, 828 (internal quotation marks omitted). While criminal contempt "is intended to punish

the contemnor and to vindicate the authority of the court," civil contempt is intended to "enforce compliance with an order of the court and to compensate the aggrieved party for any loss or damage sustained as a result of the contemnor's noncompliance."[17] *Loewinger*, 977 A.2d at 915-16 (quoting *D.D.*, 550 A.2d at 43-44); *see also Cheek v. Edwards*, 215 A.3d 209, 215 (D.C. 2019) (quoting same). "Because civil contempt sanctions are viewed as nonpunitive and avoidable, fewer procedural protections for such sanctions have been required. To the extent that such contempts take on a punitive character, however, and are not justified by other considerations central to the contempt power, criminal procedural protections may be in order." *Bagwell*, 512 U.S. at 831.

In turn, the U.S. Supreme Court has extended that dichotomy—between punitive, criminal contempt for past acts and coercive or remedial civil contempt to induce future acts—to the context of fines. *Id.* at 829. In *International Union, United Mine Works of America v. Bagwell*, the Court considered $52 million in contempt fines charged against a labor union to be criminal rather than civil. *Id.* at

---

[17] Some courts have acknowledged that the distinction between civil and criminal contempt may be "cloudy at best," *see DiSabatino v. Salicete*, 671 A.2d 1344, 1349 (Del. 1996) (quoting *City of Wilmington v. General Teamsters Local Union*, 321 A.2d 123, 125 (Del. 1974)), or, at least, a task that comes with the "difficulty of drawing a bright line," *see Salazar v. District of Columbia*, 602 F.3d 431, 438 (D.C. Cir. 2010).

837-38. A state trial court held a union in contempt for strike-related activities that violated an injunction, holding civil contempt hearings and assessing $100,000 for any future violent breach and $20,000 for any future nonviolent breach. *Id.* at 824. The fines totaled $64 million. *Id.* After the union and companies settled their dispute and agreed to vacate the contempt fines, the trial court vacated $12 million owed to the companies, but refused to vacate the remaining $52 million. *Id.* at 825.

The Court observed that "[w]here a fine is not compensatory, it is civil only if the contemnor is afforded an opportunity to purge." *Id.* at 829 (explaining that, in *Penfield Co. of Cal. v. Sec. Exch. Comm'n*, 330 U.S. 585, 588 (1947), a "flat, unconditional fine" that "total[ed] even as little as $50" was "criminal if the contemnor ha[d] no subsequent opportunity to reduce or avoid the fine through compliance"). The Court then concluded the $52 million was a matter of criminal contempt: The fines were not "calibrate[d]" to the damages caused by the activities triggering the contempt order, *id.* at 834, not compensatory to either the companies or the counties where the activities took place, *id.*, and not imposed with an "opportunity to purge once imposed," *id.* at 837. While the trial court announced the $20,000 or $100,000 per violation penalties in advance, the Court concluded that "[t]he union's ability to avoid the contempt fines was indistinguishable from the ability of any ordinary citizen to avoid a criminal sanction by conforming his behavior to the law." *Id.*

From *Bagwell*, we determine that if a contempt is criminal rather than civil, a party may be entitled to "enhanced procedural protections beyond notice and an opportunity to be heard." *Wolters Kluwer Fin. Servs., Inc. v. Scivantage*, 564 F.3d 110, 116-17 (2d Cir. 2009) (citing *Mackler Productions, Inc. v. Cohen*, 146 F.3d 126, 128 (2d Cir. 1998) (discussing *Bagwell*)). Whether a contempt is considered criminal rather than civil—and what process is due—depends on factors including: "(1) whether the sanction is intended to be compensatory or punitive; (2) whether the sanction is payable to another party or to the court; (3) whether the sanction was retrospective or whether it sought to coerce future compliance; (4) whether the sanctioned party had an opportunity to purge; and (5) whether the size of the required payment was substantial." *Id.* at 117 (summarizing *Bagwell*); *compare Nat'l Org. for Women v. Operation Rescue*, 37 F.3d 646, 661 (D.C. Cir. 1994) (concluding contempt fines were criminal where fines were "at least partly noncompensatory, and the district court nowhere made a determination as to what injury was being compensated, or why fines in these amounts were appropriate compensation"), *DiSabatino v. Salicete*, 671 A.2d 1344, 1346, 1350-52 (Del. 1996) (finding $18,000 in contempt fines to be criminal—despite being payable to appellee—since fines were "not compensatory" and "not purgeable by subsequent compliance," and resulted from "out-of-court violations of a judicially mandated course of conduct"), *and Evans v. Williams*, 206 F.3d 1292, 1296 (D.C. Cir. 2000) (finding series of "one-

time determinate fine[s]" imposed for violations of consent decree to be criminal since, once imposed, the fines could not be "eliminate[d] through future compliance"), *with Kayode*, 312 A.3d at 1232 (determining that a court order that appellant "come into immediate compliance with its order and pay the $14,462.27 constituted a remedial sanction because it sought to compensate" appellee "for losses sustained in the course of the litigation") (internal quotation marks omitted), *New York State Nat'l Org. for Women v. Terry*, 159 F.3d 86, 94-95 (2d Cir. 1998) (concluding contempt fines were civil where contempt order had "purge provision" excusing fines if "within 60 days from the date of the court's order, [defendants] file and publish an affirmation of their intent to abide by the Permanent Injunction"), *and Salazar v. District of Columbia*, 602 F.3d 431, 440 (D.C. Cir. 2010) (concluding contempt fines were civil where "the District was fined pursuant to a schedule of per diem fines and it had an opportunity to limit or avoid the fines altogether by complying with the *Settlement Order* after the issuance of the *2006 Order*").

### b.     Application to the $3,000 fine

Applying these factors to the trial court's finding of contempt—and its choice to impose $3,000 in fines for the six custodial violations—leads us to conclude that the trial court imposed a civil rather than criminal contempt.[18]

Looking at the factors articulated in *Scivantage*, we conclude that the first three factors weigh in favor of concluding the fine was civil.  The fine was (1) "intended to be compensatory," and (2) "payable to another party" and not the court.  564 F.3d at 117.  The $3,000 in sanctions appears designed in part to compensate G.D.  It was payable to G.D.—and not the court—for "expenses related to the minor children."  Next, we conclude that the fine (3) "sought to coerce future compliance." *Id.*  Recall that the trial court put the parties on notice that "if the Court determines that either party is in contempt for failure to follow the provisions of this Order or the Court's Custody Orders, they may be fined as much as $500 for each such instance of contempt."  While C.C. argues that "the claimed violations by C.C. were long over and moot for months by the time the trial court decided the issue,"

---

[18] G.D. appears to argue that C.C. has waived any claims against the $500 fine imposed against her since C.C. filed a motion for contempt against G.D.  We do not consider her claim waived just because she sought a similar contempt fine against G.D., but decline to address the $500 fine imposed on G.D. since he has not challenged that fine on appeal.

that argument misses the fact that the trial court warned about a potential fine on March 20, 2020, before the violations that formed the Third Motion for Contempt took place.

Normally, we would next consider whether (4) "the sanctioned party had an opportunity to purge." *Id.* "A purge provision permits the contemnor to escape a fine by conforming his conduct to the court's order or by declaring an intention to do so. The absence of a purge provision means that the fine will be imposed regardless of reform and commitment to obey." *Terry*, 159 F.3d at 94. But here, since we conclude the fines were compensatory, we do not reach the issue of whether the fine came with an opportunity to purge.[19]

Finally, we disagree that (5) "the size of the required payment was substantial." *Scivantage*, 564 F.3d at 117. Of course, whether the size of a fine is "serious," *Bagwell*, 512 U.S. at 837, will depend on the circumstances of a particular case. And we acknowledge that the monthly payments of $500 amounted to over half of her monthly child support obligation. But given the relatively small size of

---

[19] The trial court's order is somewhat unclear on this point. When the trial court granted G.D.'s Third Motion for Contempt, the court stated, "[*C.C.*] *may purge this contempt* by following the custodial schedule set forth herein and by complying with [G.D.]'s request to have three days with the minor children in addition to the schedule above" (emphasis added). We cannot tell whether this purge provision extended to the $3,000 fine mentioned below.

the fine and the fact that the fine was small enough to be paid off in as few as five months, we do not deem this fine to be an amount that would give us pause.

To summarize, the $3,000 fine amounted to a finding of civil rather than criminal contempt because the fine served a compensatory purpose, was payable to G.D., sought to coerce future compliance, and was a relatively small amount.[20]

## C.    Child Support

C.C. argues that the trial court abused its discretion when the court required both parties to pay for private school tuition for A.D.—who was attending a public school at the time of the trial—"without making findings regarding the child's reasonable needs based on actual family experience, as required by the child support statute."  Based on the requirement for written findings to support a child support award exceeding District of Columbia guidelines, we agree that further written findings were needed to support an award of private school tuition for A.D.

---

[20] In arguing that the $3,000 fine was a criminal contempt that necessitated additional procedural protections, the one protection C.C. appears to argue for is a prosecutor separate from an adverse party or the court.  We decline to address this argument not only in light of our finding that the fine constituted a civil contempt, but also because C.C. has not explained the basis for seeking a prosecutor—let alone how the lack of a prosecutor affected her procedural or substantial rights.

"'A trial court has a considerable measure of discretion in determining the appropriate amount of alimony and child support,' and 'that determination will not be disturbed on appeal unless the court clearly abused its discretion.'" *Ford v. Castillo*, 98 A.3d 962, 965 (D.C. 2014) (quoting *Araya v. Keleta*, 65 A.3d 40, 48 (D.C. 2013)). In reviewing a child support order for abuse of discretion, we "must determine whether the decision maker failed to consider a relevant factor, whether he relied upon an improper factor, and whether the reasons given reasonably support the conclusion." *Crater v. Oliver*, 201 A.3d 582, 584 (D.C. 2019) (quoting *Johnson v. United States*, 398 A.2d 354, 365 (D.C. 1979)).

In a case like this—where, as the trial court correctly noted, the District of Columbia Child Support Guidelines do not apply since the parents' combined adjusted gross income exceeds $240,000 per year—the trial court has discretion to award more child support. *See* D.C. Code § 16-916.01(h); *see also Upson v. Wallace*, 3 A.3d 1148, 1158 (D.C. 2010) (quoting same). Using the maximum income of the guidelines ($240,000) as a baseline,[21] a judicial officer "may exercise

---

[21] In establishing the support assigned at the guideline maximum as a presumptive award and allowing for judicial discretion to deviate from that award, we follow a common approach utilized by at least seventeen states. For a discussion on how our approach to discretion in child support determinations compares to other jurisdictions, see Charles J. Meyer, Justin W. Soulen & Ellen Goldberg Weiner, *Child Support Determinations in High Income Families - A Survey of the Fifty States*, 28 J. Am. Acad. Matrim. Law. 483, 502-05 (2016).

discretion to order more child support, after determining the reasonable needs of the child based on actual family experience." D.C. Code § 16-916.01(h). An officer doing so "shall issue written factual findings stating the reasons for an award of additional child support." *Id.*

Neither the legislative history of Section 16-916.01(h) nor our case law have analyzed what qualifies as "the reasonable needs of the child based on actual family experience."[22] Nor could we; the case-by-case needs of each child explain why this matter is left to a judicial officer's discretion. But the child support guidelines statute requires that a judicial officer give a written explanation "in some form" when ordering more child support. *See Hight v. Tucker*, 757 A.2d 756, 760 (D.C. 2000);

---

[22] In 2006, the Council of the District of Columbia removed language that expressly gave a judicial officer authority to order a parent to pay for private school tuition for a child and added the current language allowing a judicial officer discretion to order more support based on "actual family experience." *Compare* Domestic Relations Laws Clarification Act of 2002, D.C. Law 14-207, § 2, 49 D.C. Reg. 7827 (2002) (adding to D.C. Code § 16-916.01(n) that in "shared custody situations, the judicial officer shall have the authority to order either parent to pay a portion of the following expenses for the child . . . private school tuition . . . and other such expenses. The payments may be in addition to any award of child support."), *with* Child Support Guideline Revision Act of 2006, D.C. Law 16-138, § 2, 53 D.C. Reg. 3650 (2006) (see above). While the Council did not discuss what "actual family experience" might or might not include, we note that in the same legislation, "actual family experience" is used to determine reasonable child care expenses under D.C. Code § 16-916.01(k). *See* Child Support Guideline Revision Amendment Act of 2006, Report on Bill 16-205 at 12-13 (Feb. 28, 2006).

*see also Robinson v. Robinson*, 629 A.2d 562, 568-70 (D.C. 1993) (remanding where trial court's findings did not show whether parent had met applicable standard for modification of child support award); *Upson v. Wallace*, 3 A.3d 1148, 1158-59 (D.C. 2010) (upholding, in case where parents' adjusted gross income exceeded $240,000, order of *pendente lite* child support where trial court "consider[ed] the relevant factors," including parent's "income and lifestyle").

Here, however, we cannot determine the reasonableness of the award of additional child support to cover both R.D. and A.D.'s tuition for private school—let alone whether requiring so was "based on actual family experience." *See* D.C. Code § 16-916.01(h). To be sure, when considering the best interests of the children for custody purposes, the trial court recounted two facts relevant here. One was that A.D. had been attending a public school for years and, after finishing fifth grade, would have to attend a new school starting in the 2021-2022 school year. The other was that, in a "pattern of first consulting the children . . . and then informing G.D. what she and the two children had decided," C.C. began discussing with A.D. attending a private school for fifth grade, his last year of elementary school. Despite doing well academically and having friends at his public school and a court-appointed psychologist recommending against switching schools, A.D. had become interested in a particular private school—upon C.C.'s encouragement.

Still, as of the issuance of the amended Findings of Fact and Conclusions of Law, A.D. was set to spend his last year of elementary school at his then-current public school. And in its findings of fact for child support and related expenses, the trial court only discussed the parties' dispute over paying R.D.'s tuition before requiring the parties to "split private school tuition for both children" beginning in 2021-2022. That conclusion leaves us uncertain about, for example, whether the parties have even decided to send A.D. to a private school after fifth grade—let alone what the cost of schooling might have been or (as C.C. claims) whether including private schooling for both children exceeds either parent's ability to pay.

Those uncertainties would be difficult to rectify through a future motion for modification. G.D. argues that C.C.'s challenge to the payment of private school tuition for A.D. will not be ripe until an actual possibility exists that A.D. might attend a private school, and that, "[w]hen the time is ripe," C.C. should raise any such concerns to the trial court. But even a modification of the current support order to account for private school tuition for A.D. would lack a rationale for why both parents would be obligated to pay for tuition for A.D., a child who had not been to private school before the trial in this matter nor demonstrated a need to attend one. And without a rationale, this court would be unable to review any subsequent modifications to the child support award.

We therefore remand to the trial court to make express written findings as to whether the parties are to split private school tuition for both children, and as to what "the reasons [are] for an award of additional child support." *See* D.C. Code § 16-916.01(h).

### D. Attorney's Fees

The trial court awarded G.D. $108,728.41 from his July 15, 2020, fees motion, which covered his pre-trial and trial work through November 2019, and $34,663.31 from his July 31, 2020, motion, which covered his two contempt motions, Motion for Temporary Legal Custody, motion to supplement the record, trial work, and post-trial work. Due to our conclusions above on concealment and child support, we vacate the trial court's awards of attorney's fees[23] and costs related to the trial

---

[23] As our answer to "one of the burning legal questions of our generation"— that is, whether to use "attorney's fees," "attorneys' fees," "attorney fees," or "attorneys fees"—and, in line with this court's style guidelines, this Division uses "attorney's fees" as the proper term for this decision. *Est. of Gentry v. Hamilton-Ryker IT Sols., LLC*, No. 3:19-CV-00320, 2023 WL 5018432, at *1 n.2 (S.D. Tex. Aug. 7, 2023) (discussing uses of "attorney fees," "attorneys fees," "attorney's fees," or "attorneys' fees" in the Fifth Circuit, Sixth Circuit, Federal Rules of Civil Procedure, and U.S. Supreme Court, and by grammarian Bryan Garner), *report and recommendation adopted*, No. 3:19-CV-00320, 2023 WL 5489046 (S.D. Tex. Aug. 24, 2023); *see also* D.C. Court of Appeals, *District of Columbia Court of Appeals*

court's conclusions of law on child custody and child support and on the temporary custody motions. But we affirm the awards of attorney's fees and costs that relate to G.D.'s Second and Third Motions for Contempt.[24]

On appeal, "[o]ur review of a trial court ruling on a motion for attorney's fees is limited 'because disposition of such motions is firmly committed to the informed discretion of the trial court.'" *Cave v. Scheulov*, 64 A.3d 190, 193 (D.C. 2013) (quoting *Murphy v. Okeke*, 951 A.2d 783, 791 (D.C. 2008) (quoting *Steadman*, 514 A.2d at 1200)). "An appellant must make a 'very strong showing of abuse of discretion' to convince this court to set aside the trial court's decision." *Id.* (quoting *Steadman*, 514 A.2d at 1200). "However, when addressing the trial court's authority to award attorney's fees, our standard of review is *de novo*." *Assidon v. Abboushi*, 16 A.3d 939, 942 (D.C. 2011).

First, the trial court had the authority to award fees and costs under the necessaries doctrine if "counsel was necessary to protect the interests of the child." *Khawam II*, 214 A.3d at 460 (quoting *Kenda v. Pleskovic*, 39 A.3d 1249, 1257 (D.C.

---

*Citation and Style Guide* § 10.1 (2023), https://www.dccourts.gov/sites/default/files/matters-docs/DCCACitationGuide.pdf; https://perma.cc/QC3M-JL2K.

[24] We also affirm G.D.'s unopposed October 2019 fees affidavit, which led to a $1,760.00 award, and C.C.'s unopposed July 2020 fees motion, which led to a $2,581.26 award.

2012)). Here, we remand due to the need for specific findings on G.D.'s two temporary custody motions.

Second, we affirm the attorney's fee awards for the Second and Third Motions for Contempt since the trial court did not abuse its discretion when it applied the two-step test from *Steadman v. Steadman*, 514 A.2d 1196, 1200-01 (D.C. 1986).

### 1.    Custody and the Necessaries Doctrine

We discuss our case law on the necessaries doctrine and conclude that we are unable to determine from the trial court's findings whether the necessaries doctrine applied to the temporary custody motions.

### a.    Case Law

In our jurisdiction, each party is generally responsible for its own attorney's fees unless an exception applies. *See Khawam II*, 214 A.3d at 459. An exception may come from statutory authority, contractual agreements, or a "narrowly defined common law exception[]." *See id.* (citations omitted); *Assidon*, 16 A.3d at 942 (quoting *6921 Ga. Ave., N.W., Ltd. P'ship v. Universal Cmty. Dev., LLC*, 954 A.2d 967, 971 (D.C. 2008)). One of those common law exceptions is the necessaries doctrine. *See Khawam II*, 214 A.3d at 459. Under that doctrine, "in a custody

dispute, a trial court is authorized to grant attorney's fees where the court finds that counsel was necessary to protect the interests of the child." *Id.* (brackets omitted).

Courts evaluating the necessity of counsel focus on the "need for representation." *See Khawam v. Wolfe*, 84 A.3d 558, 575 (D.C. 2014) ("*Khawam I*") (citing *Kenda*, 39 A.3d at 1257). In *Paine v. Paine*, we first applied the necessaries doctrine when we upheld an award of attorney's fees to a mother who successfully defended against a father's child custody challenge. 267 A.2d 356, 357 (D.C. 1970). Since a parent's legal duty to support their children includes providing necessaries like "[f]ood, clothing, and lodging," we concluded that "counsel fees are also necessaries when counsel must be engaged to protect a minor's welfare." *Id.* Six years later, in *Eisenberg v. Eisenberg*, we held that a trial court had authority to reimburse a mother for attorney's fees after she successfully sought custody. 357 A.2d 396, 401-02 (D.C. 1976). The mother had custody of her two boys under a separation agreement and let the boys live with their father, who sought to send them to boarding school. *Id.* at 401. "Since the trial court ultimately found that the interests of the two boys were best served by giving their mother legal custody, the court was authorized to order that she be reimbursed for the court costs and attorney's fees which she incurred in order to regain custody." *Id.* at 401-02. Similarly, in *Prost v. Greene*, we affirmed an award of attorney's fees when a mother filed a motion for reconsideration and the father—who had custody—had to respond.

675 A.2d 471, 474 (D.C. 1996). We concluded that "when counsel is required by the party in whose custody the court has deemed to have been in the children's best interests, attorney's fees may be granted to that party in defending such grant." *Id.* Finally, in *Khawam II*, we declined to "limit[] the scope of the necessities doctrine to particular procedural contexts," and held that the doctrine applies "broadly" in custody cases.[25] 214 A.3d at 461. While we did not consider the necessity of counsel, we concluded that a trial court "must require more than merely that counsel was helpful to a party who on balance prevailed on an issue of custody," *id.* at 462, and may not turn the necessaries doctrine into a "fee-shifting provision," *id.*, but need only evaluate the necessity of counsel.

In short, our decisions have turned on whether "counsel was *necessary* to *protect* the interests of the child." *See id.* at 462 (quoting *Eisenberg*, 357 A.2d at 401); *compare Martin v. Tate*, 492 A.2d 270, 273 (D.C. 1985) (upholding award of attorney's fees after mother successfully obtained custody of children after having *de facto* custody for nine years), *and Maybin v. Stewart*, 885 A.2d 284, 288 (D.C. 2005) (upholding award of attorney's fees where father ceased visitation attempts in 1994 and then filed motion to expand visitation in 1998, meaning mother "had to

---

[25] In *Khawam II*, the appellant mother did not challenge the trial court's finding that counsel was necessary to protect the best interests of the child. 214 A.3d at 460.

retain counsel to defend her child's best interests"), *with Kenda*, 39 A.3d at 1257 (affirming trial court's rejection of fees where parent sought fees "related to work performed after the parties reached an agreement to share custody" and where "the court found that the attorneys who contributed the most to [the child]'s best interest were the guardians *ad litem*, who ultimately recommended that the court award the parties joint-custody" (emphases omitted)).[26]

### b.    The Temporary Custody Motions

Since we have applied the necessaries doctrine in custody cases and we vacate and remand the trial court's custody finding here, we need not address whether the trial court correctly applied the necessaries doctrine to fees and costs related to child custody.  Based on the record before us, however, we remand to the trial court the issue of whether to award attorney's fees and costs for the temporary custody motions.

We have applied the necessaries doctrine in cases concerning temporary custody.  In *Assidon v. Abboushi*, for example, we upheld an award of attorney's

---

[26] *Kenda* considered a statutory award of attorney's fees under Section 312 of the Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA"), D.C. Code § 16-4603.12, and not an award of fees under the necessaries doctrine, but still turned on whether a trial court found that "counsel was necessary to protect the interests of the child."  *See* 39 A.3d at 1257.

fees in an award of temporary custody to a mother that invoked a trial court's emergency jurisdiction under the UCCJEA. 16 A.3d at 942-43. There, the trial court protected the mother by issuing a protective order against the father and protected the child by providing for supervised visitation by the father. *Id.* at 943. Since "legal representation was a must due to the complexity of the case," we agreed that the trial court had authority to award fees. *Id.* (internal quotation marks omitted). Unlike the trial court in *Assidon* that pointed to the emergency nature of its jurisdiction under the UCCJEA and the necessity of counsel "to protect the interests of the child" through temporary custody and supervised visitation, *see* 16 A.3d at 943, the trial court here did not discuss how G.D.'s temporary custody motions factored into its awards.

G.D. made two relevant motions: (1) a March 2, 2020, Motion for Temporary Legal Custody and (2) a May 15, 2020, Motion to Supplement the Record and for Immediate Sole Custody and Supervision. In his July 30 motion, G.D. sought $1,925.00 in fees for his successful Motion for Temporary Legal Custody, which concerned a January 2020 dispute over whether R.D. would attend her private school for the 2020-2021 school year. He also sought fees and costs related to the Motion to Supplement as part of his request for fees related to trial and post-trial work. After the Motion to Supplement, G.D. was granted temporary sole legal and physical custody, but the trial court stayed the motion after the last day of trial, maintained

sole legal custody for G.D., and awarded temporary joint physical custody following trial.

In its ruling on attorney's fees, the trial court did not address the temporary custody motions. After correctly raising the necessaries doctrine at the start of its analysis and mentioning the Motion for Temporary Legal Custody, the trial court cited the motions for contempt, its parental concealment conclusion, and the "oppressive and burdensome" nature of the litigation to conclude the necessaries doctrine applied. The trial court then discussed the necessity of counsel at the end of the two-step *Steadman* analysis (discussed in Part III.D.2 below). G.D.'s counsel argued that representation was necessary "because G.D. is not an attorney, there were intrafamily offenses, and parental kidnapping, there were experts, and it would have been difficult for G.D. to effectively cross-examine C.C. (who is an attorney),"[27] and "because of the high conflict nature of the case, challenging behavioral issues regarding the children, [and] C.C.'s substantial contributions to the family's dysfunction." The trial court "agree[d] that it was necessary for G.D. to have high quality representation to effectively address the needs of the children because the circumstances in this case were in many ways unique and complicated."

---

[27] As discussed in n.2, *supra*, while we have kept the original language here, this is a reference to the parental concealment law at D.C. Code § 16-1022(a).

Finally, the trial court considered C.C.'s arguments that G.D.'s fees were not "incurred as necessary to protect the child (including a sub-argument on actual danger to the children)" and that the Motion to Supplement and trial work "d[id] not qualify under the necessaries doctrine." It then rejected those arguments, stating that "[t]he award given under the necessaries doctrine [wa]s an award that reimburse[d] a party's costs as are necessary in the context of custody."

While the trial court's discussion might satisfy the second step of the *Steadman*, we cannot determine whether its rationale applied to both the trial court's permanent and temporary custody rulings. This matters because in this appeal, C.C. points to the trial court's modification of temporary custody after trial and following the trial court's interviews with R.D. and A.D. To be clear, we do not agree with C.C. that the trial court exceeded its discretion in awarding attorney's fees and costs to G.D. since "the children needed to be protected from G.D.'s litigation positions." Our decisions on attorney's fees have only considered whether counsel was required for the party whose custody was in the best interests of the child. Still, we will not reverse an award of fees and costs under the necessaries doctrine when a trial court finds that "counsel [wa]s required by the party in whose custody the court has deemed to have been in the child's best interests," *see Maybin*, 885 A.2d at 288 (brackets omitted).

When a trial court awards custody temporarily, it is important that a reviewing court be able to determine how temporary awards of custody influenced ultimate awards of attorney's fees and costs. Since we cannot do so here with respect to the temporary custody motions, and since the trial court's findings on the necessity of counsel relied in part on the existence of intra-family offenses that we reversed above, on remand, we instruct the trial court to make specific findings on whether counsel was necessary for the temporary custody motions.

### 2. Contempt Motions and the *Steadman* Test

We, however, conclude that the trial court acted within its discretion when it awarded attorney's fees and costs for the Second and Third Motions for Contempt.

A party found in contempt is "ordinarily required" to pay attorney's fees, even "absen[t] a finding of willfulness." *See Loewinger*, 977 A.2d at 924-25; *see also Link v. District of Columbia*, 650 A.2d 929, 932 (D.C. 1994) ("Where, as here, a litigant has failed to carry out its obligations under a court order, the trial court enjoys broad discretionary powers to fashion remedial relief. That discretion includes the authority to award counsel fees." (citation omitted)). In cases concerning child custody, we have applied a "two-step inquiry in cases in which a fee is awarded: first, whether to award a fee, and if so, to whom." *Steadman*, 514 A.2d at 1200-01; *see also Assidon*, 16 A.3d at 943 (applying *Steadman* test in custody dispute); *Kenda*,

39 A.3d at 1257 (same); *Maybin*, 885 A.2d at 288 (same). "Only when that preliminary decision has been made does the court further exercise its discretion in setting the amount." *Steadman*, 514 A.2d at 1201. While our remands on child custody, child support, and the temporary legal custody motions obviate the need to analyze the trial court's *Steadman* analyses on those issues, we review the trial court's two-step inquiry on the contempt motions.

First, we conclude that the trial court acted within its discretion when it decided whether to award attorney's fees. When a court decides whether to award a fee, a court may consider factors including: "whether the litigation has been oppressive or burdensome to the party seeking the award[;]" what "the motivation and behavior of the litigating parties" was; what "the quality of the services rendered, the skills of counsel, the result of the litigation, the difficulty of the case, and the ability of the party against whom the award is sought to pay attorney's fees" were; and how "the respective earning capacities of the parties" may affect the award. *Assidon*, 16 A.3d at 942 (brackets omitted) (quoting *Steadman*, 514 A.2d at 1200; *Rachal v. Rachal*, 489 A.2d 476, 478 (D.C. 1985)). The trial court pointed to G.D.'s three successful motions for contempt, including one "flagrant violation" that C.C. made of one of the court's orders. And the trial court found—after detailing the two-year history of the litigation, and without recounting "every action that led to additional burden"—that the litigation had been "oppressive and burdensome on

G.D." In our view, and given the complex nature of this specific case, we conclude that the trial court acted within its discretion in deciding to award attorney's fees and costs for the contempt motions.

Second, we conclude that the trial court acted within its discretion in deciding how much to award with respect to the contempt fees. "In setting the amount of the fee under the necessaries doctrine, 'among the factors the court should consider are the quality and nature of the services performed, the necessity for the services, the results obtained from the services, and the financial ability of the spouse being ordered to pay.'" *Khawam II*, 214 A.3d at 463 (quoting *Steadman*, 514 A.2d at 1200). But "the motivation and behavior of the litigating parties" and "whether the litigation has been burdensome to the party seeking the award" are factors that must "play no role in deciding the amount of the fee to be awarded." *Id.* (internal quotation marks omitted) (quoting *Steadman*, 514 A.2d at 1200). The trial court noted the thirty-year experience of G.D.'s counsel, the hourly rates of his counsel ($525 in 2018 and $550 in 2019) under the Laffey Matrix[28], the need to "have high quality representation to effectively address the needs of the children because the

---

[28] "The Laffey Matrix is a fee schedule of hourly rates for attorneys practicing in the District of Columbia, broken down by years of experience," compiled by the local United States Attorney's Office and updated annually to reflect cost-of-living changes. *Tenants of 710 Jefferson St., NW v. D.C. Rental Hous. Comm'n*, 123 A.3d 170, 182 (D.C. 2015).

circumstances in this case were in many ways unique and complicated," and the efficacy of counsel in G.D.'s motions for contempt being granted. The trial court then concluded C.C. had the ability to pay based on her annual gross salary of approximately $210,000 per year (with about $126,384 per year in take-home pay, $108,000 in annual expenses, and $18,000 per year in unallocated funds), her $1.6 million in debts mostly being to her father, and her change in employment during the litigation from a government attorney role to a "significantly more lucrative position." Finally, the trial court agreed with C.C. that G.D. had included a number of fees and costs in his July 15 motion that were unrelated to the custody dispute, and reduced its award to 70% of what G.D. had requested from the July 15 and July 30 motions.[29] Taken together, we conclude the trial court properly exercised its "broad discretion" in awarding attorney's fees and costs for the contempt motions. *Araya*, 65 A.3d at 59.

---

[29] The trial court concluded the unrelated expenses were only in G.D.'s July 15 motion, but the trial court appears to have awarded 70% of the total amount between the July 15 and July 30 motions, noting "the requested $155,326.30 [from the July 15 motion] is reduced to $108,728.41 and the requested $49,519.02 [from the July 30 motion] is reduced to $34,663.31." G.D., however, has not challenged the trial court's application of its discretion on this point and therefore we do not disturb the trial court's calculations here.

### III. Conclusion

For the foregoing reasons, we affirm in part and vacate in part the judgment of the Superior Court and remand for further proceedings.

*So ordered.*